**COMMONWEALTH OF PENN-SYLVANIA et al.**

v.

**Caspar W. WEINBERGER et al.**

**Civ. A. No. 1606–73.**

United States District Court,
District of Columbia.

Dec. 11, 1973.

James R. Adams, Deputy Atty. Gen.,
Harrisburg, Pa., William C. Bednar, Jr.,

Asst. Atty. Gen., Austin, Tex., Julian Smith, Jr., Deputy Atty. Gen., Carson City, Nev., Allen D. Schwartz, Sp. Asst. Atty. Gen., Chicago, Ill., for plaintiffs.

J. Michael Cofbill, Asst. U. S. Atty., Washington D. C., for defendants.

## MEMORANDUM

AUBREY E. ROBINSON, Jr., District Judge.

This is an "impoundment" case brought by five states [1] and their chief educational officers. It is presently before the Court on cross-motions for summary judgment. Plaintiffs seek to compel the Executive Branch of the Federal Government to apportion, obligate and disburse [2] to the states their share of approximately $20 [3] million in funds appropriated by Congress for the operation of state educational programs under Title V of the Elementary and Secondary Education Act of 1965.[4] Plaintiff Commonwealth of Pennsylvania also seeks to denominate the case as a class action on behalf of all other states not named Plaintiffs herein, and on behalf of the District of Columbia.

Defendants have interposed what has now become a standard litany of defenses: no justiciable case or controversy, sovereign immunity, unconsented suit for money damages, executive discretion, historical precedent and statutory authority for impoundment. While the

Court has fully reviewed these arguments, it has concluded that they are without merit and do not warrant further discussion.[5] The primary legal issues here are 1) whether Congress has mandated that the appropriated funds be apportioned and disbursed under the statute and 2) if so, whether the expiration of the 1973 Fiscal Year on June 30, 1973, effected a reversion of the appropriated funds to the Treasury such that they are no longer available to the Defendants and relief herein is thereby barred.

## I

Title V of the Elementary and Secondary Education Act of 1965 established a program of federal grants to strengthen state departments of education. Part A of Title V [6] provides grants, inter alia, for statewide educational planning, collection and dissemination of educational data, support of special studies, publications, and experimental and research programs.[7] Part C of Title V [8] provides grants for comprehensive educational planning and evaluation on the state and local level.

The financing mechanism for Title V programs begins with Congressional appropriation of funds. From the amount appropriated, the statute requires [9] that the Commissioner of Education *"shall apportion"* the appropriated funds among the states and territories accord-

---

1. The named Plaintiff States herein are Pennsylvania, Washington, Nevada, Illinois and Texas. Each brings this action on its own behalf, on behalf of its state educational agency, and as parens patriae for its citizens and subdivisions.

2. Apportionment, obligation and disbursement are technical terms in the context of this case, each denoting a step in the statutory procedure for funding the programs here in issue. See pages 1379–1380, infra.

3. During the pendency of this action Defendants came forward with the contention that the "impounded" amount is actually only $15,100,000. Mattheis Affidavit, ¶ 5. Plaintiffs have not further disputed that figure.

4. 20 U.S.C. § 861 et seq., Pub.L. 89–10, Title V, April 11, 1965, 79 Stat. 47, as amended.

5. See National Council of Community Mental Health Centers, Inc. v. Weinberger, 361 F. Supp. 897 (D.D.C.1973), City of New York v. Ruckelshaus, 358 F.Supp. 669 (D.D.C. 1973). Cf. Note, Impoundment of Funds, 86 Harv.L.Rev. 1505 (1973).

6. 20 U.S.C. §§ 861–864.

7. 20 U.S.C. § 863.

8. 20 U.S.C. § 867.

9. The controlling provision for Title V—Part A is 20 U.S.C. § 862(a)(1); for Part C, 20 U.S.C. § 867(c)(1)(A). The funding mechanism of both Parts is identical for purposes of this case and will be treated hereinafter as one.

ing to a prescribed formula.[10] Upon apportioning the appropriated funds the Commissioner notifies the states of the amounts available to them. On the basis of this notification the states prepare formal applications for grant awards. Upon approval of the formal applications the Commissioner issues grant awards, the formal documents obligating the funds to the States.[11] Thereafter the states draw these funds by means of vouchers which ultimately reach the Treasury Department and are recorded there as disbursements on the proper accounts.

Thus the act of apportioning the appropriated funds among the states is only the first step in the disbursement process, a step which does not involve the actual expenditure of funds.[12] In practice, however, the states generally apply for, and the Commissioner generally awards, the entire amount apportioned. Awards by the Commissioner are subject to the states having "approved programs" for expenditure of the funds. Defendants have not contended that any

plaintiff state does not have an approved program.[13]

Appropriations for Title V of the Elementary and Secondary Education Act for the 1973 Fiscal Year (FY 1973) were made by Public Law 92–334, a joint resolution of the Congress signed by the President. This was a "continuing resolution" providing funding for ongoing programs pending enactment of a formal Appropriation Act. Public Law 92–334 provided that where both houses of Congress had approved continued funding of a program, but at different levels, funding would be at the lower of the two levels approved by either house of Congress.[14] The Senate version of the Labor-HEW Appropriation Act of 1973 [15] had approved $55 million for Parts A and C of Title V. The House version of the same Act [16] had approved $43 million for Part A and $10 million for Parts C of Title V. Accordingly, under the continuing resolution the amount actually appropriated was the lesser of the House or Senate versions, in this instance $43 million for Part A and $10 million for Part C.[17]

10. The formula for Part A is at 20 U.S.C. § 862(a)(1)(A) & (B); for Part C, 20 U.S.C. § 867(c)(1)(A). Up to 2% of the appropriated funds are reserved for the territories under each Part, and these funds are not here in issue. 5% of the funds appropriated for Part A are reserved for special project grants and these funds are not here in issue.

11. Mattheis Affidavit ¶ 3(g–j); Plaintiffs' Amended Statement of Uncontested Material Facts, ¶ 16(c–g).

12. The present case to this point parallels that presented in City of New York v. Ruckelshaus, 358 F.Supp. 669 (D.D.C.1973), though in that case "allotment" preceded Congressional appropriations while apportionment herein comes only after Congress has appropriated funds.

13. There are statutory provisions for re-allocating any funds apportioned to but not actually awarded to a state. 20 U.S.C. § 862(b)(1); 20 U.S.C. § 867(c)(2). The complaint herein alleges (¶ 27), and the Answer admits, the Plaintiffs have approved state plans as required by 20 U.S.C. § 864 and its implementing rules and regulations.

14. Whenever the amount which would be made available or the authority which would be granted under an Act listed in this subsection as passed by the House is different from that which would be available or granted under such Act as passed by the Senate, the pertinent project or activity shall be continued under the lesser amount or the more restrictive authority.

. . .

Public L. 92–334, § 101(a)(3), July 1, 1972.

15. H.R. 15417, June 28, 1972.

16. H.R. 15417, June 15, 1972, 118 Cong.Rec. H5672, 5677, 5682, (daily ed. June 15, 1972) H.R.Rep. 1118, 92nd Cong., 2d Sess. 47–48.

17. See S.Rep. No. 44, 93d Cong., 1st Sess., 2 (1973). The President's proposed Budget for Fiscal Year 1973 had sought only $33 million for Part A and $10 million for Part C. Yet P.L. 92–334 made it clear that the President's budget proposals were to be considered in determining the amount actually appropriated only where a program was not funded by either one or both houses of Congress. P.L. 92–334, §§ 101(a)(4) and 101(b). Such was not the case with regard to Parts A and C of Title V, ESEA.

Defendants do not dispute that these are the amounts actually appropriated.[18]

■■ Statutory language that an official "shall" perform an act has been repeatedly held to be mandatory in nature.[19] It deprives the official of discretion and makes the commanded act a duty, a ministerial act. The legislative history of the provision here involved makes clear its mandatory nature.[20] Thus, the Commissioner of Education was required by statute to apportion to the states the full amount of appropriated funds for Parts A and C of Title V.

It is not readily ascertainable, however, whether the statute mandates the Commissioner to approve all applications and actually disburse all apportioned funds. The statutory language with regard to these steps is not the mandatory "shall", but discretionary language that the Commissioner "may", and "is authorized to" make grant awards.[21] Yet this Court would find it implicit in the statutory scheme, absent express indications to the contrary, that in providing the Commissioner with some discretion as to grant awards the Congress did not intend to allow him the opportunity to completely suspend or severely limit, for reasons unrelated to the program, the operations of an ongoing program reviewed, approved and fully funded by the Congress with Presidential approval.[22] Such an approach would place administrative fiat above the law.

It is not necessary to rely on implication, however, for Congress has made clear its intent to require full funding of education programs. Section 415 of the General Education Provisions Act,[23] 20 U.S.C. § 1226, contains the controlling language which has now been repeatedly held[24] to express Congressional intent to mandate full funding of ongoing programs:

> Notwithstanding any other provision of law, unless expressly in limitation of the provisions of this chapter, funds appropriated for any fiscal year to carry out any of the programs to which this chapter is applicable shall remain available for obligation and expenditure until the end of such fiscal year.

18. Defendants Statement of Material Facts, ¶ 7. Mattheis Affidavit ¶ 3(c)(d)(e).

19. " 'Shall' is the language of command." Boyden v. Commissioner of Patents, 142 U.S.App.D.C. 351, 441 F.2d 1041, 1043 n.3 (1971), citing Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935) and Richbourg Motor Co. v. United States, 281 U.S. 528, 534, 50 S.Ct. 385, 74 L.Ed. 1016 (1930).

20. Congress intended a "formula grant" program wherein each state's available share was as determined under the formula prescribed by Congress. S.Rep.No.146, 89th Cong. 1st Sess. (1965) at 51, U.S.Code Cong. & Admin. News, 1965, p. 1496:
"Subsection (a) describes the manner in which . . . the funds which are available for making grants under this title *will be apportioned.* . . . (emphasis added)"; Id. at 32, U.S.Code Cong. & Admin. News 1965, p. 1477: "*The Commissioner will apportion* $100,000 to each state and then apportion the remainder . . . among the States on the basis of the relative number of public school pupils within the States." (emphasis added). Cf. H.R. Rep.No.143, 89th Cong., 1st Sess., at 20, 37 (1965).

21. 20 U.S.C. § 863; 20 U.S.C. § 867.

22. See State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1109–1110 (8th Cir. 1973), cf. Commonwealth of Pennsylvania v. Lynn, 362 F.Supp. 1363, (D.D.C. 1973), Pealo v. Farmers Home Administration, 361 F.Supp. 1320 (D.D.C.1973), National Council of Community Mental Health Centers v. Weinberger, 361 F.Supp. 897 (D.D.C.1973), Note, Impoundment of Funds, 86 Harv.L.Rev. 1505 (1973).

23. Pub.L. 90–247, Title IV § 415, *formerly § 406,* as added Pub.L. 90–576, Title III, § 301(b), October 16, 1968, 82 Stat. 1094, amended Pub.L. 91–230, Title IV, § 401(a)(9), April 13, 1970, 84 Stat. 166, and renumbered Pub.L. 92–318, Title III, § 301(a)(1), June 23, 1972, 86 Stat. 326.

24. National Council of Community Mental Health Centers v. Weinberger, 361 F.Supp. 897, 902–03 (D.D.C.1973), Association of American Medical Colleges v. Weinberger, Civil Action 1830–73 (D.D.C. Oct. 26, 1973), Commonwealth of Pennsylvania v. Weinberger, Civil Action 1125–73 (D.D.C. November 21, 1973). Cf. State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1110–1111 n. 15 (8th Cir. 1973).

This provision is not on its face an unambiguous command to spend, thus the Court must look to Congressional intent in order to clarify its meaning. This section was added in 1968 [25] without extended discussion at the tine as to its meaning or intended effect.[26] The two instances where the provision was discussed, however, indicate clearly that it was intended to deny to the Administration any statutory authority to refuse to spend appropriated education funds.[27] This meaning was more expressly declared in 1970 when the section was amended to apply to expenditure as well as obligation of funds. The Senate Report forthrightly expressed the intent of the amendment and the original section:

> The Committee . . . agrees that section [415] is permanent legislation exempting all appropriations to the Office of Education from statutory controls other than those specified in the authorizing legislation and in appropriations acts. . . . [28]

Significantly, the Senate Report also notes the Administration's interpretation of Section 415 as a mandatory spending provision:

> The Vocational Education Amendments of 1968 contain a provision permanently exempting appropriations made to the Office of Education from administrative controls on obligation and spending.[29]

In this light the Court finds that Congress intended Section 415 as a prohibition on impoundment of funds for education programs covered by these provisions. Accordingly, it is defendants duty to accept, review, and approve or disapprove *for program-related reasons*, applications for grant-awards up to the full amounts appropriated by Congress and apportioned to the states. Before requiring such action, however, the Court must examine the Defendants' contentions that relief herein is barred by the expiration of Fiscal Year 1973, the lapse of the appropriations therefor and reversion of the disputed funds to the Treasury.

## II

A. The funds at issue here were appropriated for Fiscal Year 1973, which ended June 30, 1973. Plaintiffs contend, however, that the relevant appropriations were extended and made available for "obligation and expenditure" for an additional fiscal year by operation of a 1970 amendment to the General Educa-

25. Note 23, supra.

26. The provision originated in the Senate version as Sec. 201(b) of Title II of S. 3770, the Vocational Education Amendments of 1968. Thus there is no mention of it in the House Report (No. 1647, 90th Cong. 2d Sess.). The Senate and Conference Reports mention the section with an unelaborated presentation of its provisions. S.Rep.No.1386, 90th Cong. 2d Sess. 154 (1968). Conf.Rep.No.1938, 90th Cong. 2d Sess. —— (1968) (114 Cong.Rec. 29460, 29467 ;. 1968 U.S.Code Cong. & Admin. News, pp. 4202, 4219).

27. See 114 Cong.Rec. 29014 (1968) (Remarks of Senator Morse, ranking member of the Committee on Labor and Public Welfare which reported the bill) :
   The language of Section 406 simply requires that appropriations for any fiscal year for education programs which constitute a new obligational authority shall remain available for obligation until the end of the fiscal year for which they are appropriated. *This section would override*

*any statutory authority the President might have to prevent by affirmative act the obligation of fiscal year 1969 appropriations.* (emphasis added).
See also the colloquy between Rep. Perkins (Chairman of the House Committee on Education & Labor and ranking House member of the Conference Committee which reported the final version of the bill) and Rep. Mahon (Chairman of the Appropriations Committee) at 114 Cong.Rec. 29480–81 (1968), to the same effect. Cf. State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1110–1111 n. 15 (8th Cir. 1973).

28. S.Rep.No.91–634, 91st Cong. 2d Sess., 78 (1970) (1970 U.S.Code Cong. & Admin.News p. 2768 at pp. 2821–2822). Cf. S.Rep. at 163, U.S.Code Cong. & Admin.News at p. 2895.

29. Id., quoting the Budget Message of the President for Fiscal Year 1970, at 23. The Senate Report also indicates that the Administration sought repeal, unsuccessfully, of Section 415.

tion Provisions Act known as the Tydings Amendment:

> Notwithstanding any other provision of law, unless enacted in specific limitation of the provisions of this subsection, any funds from appropriations to carry out any programs to which this chapter is applicable during any fiscal year, ending prior to July 1, 1973, which are not obligated and expended prior to the beginning of the fiscal year succeeding the fiscal year for which such funds were appropriated shall remain available for obligation and expenditure during such succeeding fiscal year.[30]

The Tydings Amendment applies to education appropriations generally, and its application to the programs here in issue is not disputed. The meaning and effect of the Amendment, however, are disputed.

A "plain meaning" analysis of the Amendment would support Plaintiffs interpretation, for § 1225(b) contains no words of limitation which would restrict its applicability to the programs here in issue. Yet Defendants rely upon three arguments to persuade the Court that Congress did not intend the extra year of availability for "obligation and expenditure" of education funds to apply at the Federal level. Defendants contend that the extra time period is available only to state and local educational agencies.

Defendants first argument focuses on the fact that subsection 1225(b) was offered as an amendment to Section 414 of the General Education Provisions Act, 20 U.S.C. § 1225.[31] That section had previously related expressly, and solely, to expenditures at the state and local levels (allowing calculation of expenditures on a school year basis, rather than fiscal year basis.) Defendants argue that the Tydings Amendment was added to this section because it, too, was intended to apply only to state and local agencies, and that this is the reason for its placement in Section 414 (20 U.S.C. § 1225). Yet this argument cuts both ways. Section 1225(a) expressly relates to the "agency or institution" on the state or local level. Thus Congress knew how to limit its language to those levels when it wanted to do so. The fact that the language of subsection 1225(b) is not so limited can just as well mean, then, that Congress did not intend to limit its application to the state and local levels. In this context an argument premised on the placement of a subsection is tenuous at best.

The second basis offered by Defendants for their interpretation of the Tydings Amendment is the legislative history of that provision. Defendants cite Senator Tydings' comments on the Senate floor[32] wherein he stated rather clearly that his amendment was designed to alleviate planning problems brought

---

30. 20 U.S.C. § 1225(b), Pub.L. 90–247, Title IV, § 414 formerly § 405, Jan. 2, 1968, 81 Stat. 815 amended Pub.L. 91–230, Title IV, § 401(a)(8), April 13, 1970, 84 Stat. 165, and renumbered Pub.L. 92–318. Title III, § 301(a)(1), June 23, 1972, 86 Stat. 326.

31. 20 U.S.C. § 1225(a):

> Appropriations for any fiscal year for grants, loans, contracts, or other payments to educational agencies or institutions under any applicable program may, in accordance with regulations of the Secretary, be made available for expenditure by the agency or institution concerned on the basis of an academic or school year differing from such fiscal year.

Pub.L. 90–247, Title IV, § 414, formerly, § 405, Jan. 2, 1968, 81 Stat. 815 amended Pub.L. 91–230, Title IV, § 401(a)(8), April

13, 1970, 84 Stat. 165, and renumbered Pub. L. 92–318, Title III, § 301(a)(1), June 23, 1972, 86 Stat. 326.

32. 116 Cong.Rec. 2470–71; cf. 116 Cong.Rec. 2569–70. The Tydings Amendment was added to the legislation on the floor of the Senate and thus is not mentioned in either the Senate or House Report on Pub.L. 91–230. S.Rep.No.91–634, 91st Cong. 2d Sess. (1970), U.S.Code Cong. & Admin.News 1970, p. 2768, H.Rep.No.91–114, 91st Cong., 1st Sess. (1969). The amendment was retained by the Conference Committee and noted in the Conference Report:

> Section [414] is also amended by adding a new subsection providing for the carryover of any unobligated or expended education funds from any fiscal year ending prior to July 1, 1973. Funds carried over

on by the necessity for "lead-time" in budget and program development and implementation at the state and local levels. Yet Defendants would draw from this an implication nowhere expressly stated or supported in the legislative history, i. e. that *only* state and local educational agencies were to have any flexibility in fund carry-over to allow for this adequate program planning and implementation. The problems toward which the Amendment was directed arose on the local level and the solution was directed there. Yet that does not necessarily mean that the Federal agencies involved were not to play any role in the solution. Carry-over of obligating authority in the Federal Office of Education would enable it to better facilitate local efforts to plan and develop a program before applying for funding, secure in the knowledge that the funds would not lapse if an application was not filed and an award made before June 30. Thus carry-over of Federal authority is entirely consistent with the purposes espoused by Senator Tydings. To say the least, it is not necessarily inconsistent with the legislative history, as Defendants would have it. At best the legislative history supports Plaintiffs interpretation, at worst it is ambiguous. Thus the Court cannot accept Defendants efforts to limit the express language of the statute.

The third basis proffered by Defendants for their limited reading of the Tydings Amendment is the argument that a broad literal reading of the section would render it inconsistent with the next section, § 415 of the General Education Provisions Act, 20 U.S.C. § 1226.[33] Review of the statute and the relevant legislative history, however, has convinced the Court that these sections were intended to serve different purposes and are entirely consistent with each other in their application.

Section 415 was added in 1968. Its purpose was, as noted earlier, to assure the continued availability of education appropriations throughout the fiscal year, to assure that the funds would not be "withheld" during the fiscal year by the Administration on the basis of budget ceilings and the like. It was not intended to lengthen, or to limit, the fiscal year as the period of time during which appropriated funds were "available" for obligation under the controlling Appropriations Act. The Tydings Amendment, on the other hand, was expressly intended to extend the period of time during which appropriated education funds could be legally obligated and expended. During that extended time period, § 415 continues to operate as Congress intended, prohibiting any other actions which would limit the availability of the funds. It is unfortunate, and perhaps confusing, that both sections use the word "available" in a similar context but with a different intent and a different meaning. Yet where Congressional intent and meaning are clear from the legislative history, as they are here, it is the duty of the Court to implement that intent. In this case the Court finds that Congress intended the Tydings Amendment to operate to make the disputed funds available for obligation until June 30, 1974.

Lastly, Defendants argue that to read the Tydings Amendment as extending for an additional fiscal year the availability of the education funds here in issue is inconsistent with Public Law 92–334, the continuing resolution discussed earlier which made the final appropriations for FY 1973. As last amended by Section 102 of Public Law 93–9, this appropriations resolution read as follows:

Appropriations and funds made available and authority granted pursuant to this joint resolution shall remain available until (a) enactment

---

may be obligated and expended during the next fiscal year. The Conference agreement adopts this provision.
Conf.Rep.No.91–937, 91st Cong., 2d Sess., at 97 (1970 U.S.Code Cong. & Admin.News at

p. 2953). This language certainly does not imply any limitation of the fund carry-over to State or local levels.

33. Text at 1381–1382, supra.

into law of any appropriation for any project or activity provided for in this joint resolution, or (b) enactment of the applicable Appropriation Act by both Houses without any provision for such project or activity, or (c) June 30, 1973, whichever first occurs.

■ While there is a facial inconsistency between this language and application of the Tydings Amendment to extend the availability of these education funds to June 30, 1974, the inconsistency disappears when reviewed in light of Congressional intent and basic principles of statutory construction. First of all Congress has expressly provided in the Tydings Amendment that its operation is to be "notwithstanding any other provision of law, unless enacted in specific limitation of this subsection." Secondly, the continuing resolution for appropriations was a general measure, providing funds for ten separate Appropriations Acts. It was originally intended as a stopgap measure pending enactment of specific Appropriations Acts, which never came about for Labor-HEW appropriations in 1973. The Tydings Amendment is a measure specifically directed at education funds, designed to better implement the programs supported by those funds. It is a basic premise of statutory construction that in such circumstances the more specific measure,

here the Tydings Amendment, is to be held controlling over the general measure where inconsistencies arise in their application. In this light the language of the continuing resolution is no bar to application of the Tydings Amendment.

■ B. Assuming for the moment that Defendants' interpretation of the Tydings Amendment is correct, and that the disputed funds were therefore available only for FY 1973, the Court finds that Plaintiffs would still prevail. Under the Budget and Accounting Act, federal funds are ordinarily available for obligation only during the fiscal year for which they were appropriated.[34] Appropriated funds which are unobligated during the designated fiscal year revert to the general fund of the United States Treasury, and are withdrawn from the appropriated accounts not later than September 30 of the succeeding fiscal year.[35] Defendants contend that by virtue of these provisions the impounded funds here in dispute are no longer available for obligation and that it is therefore impossible for the Court to grant the relief sought herein.[36]

The statutory section providing for reversion of unobligated funds [37] contains a proviso, however, to the effect that an agency head may direct restoration of reverted funds to appropriate accounts upon determining that such ac-

---

34. 31 U.S.C. § 701 et seq., cf. 31 U.S.C. § 203(d), 31 U.S.C. § 712a. "Obligation" is the term used to denote a commitment of federal funds to a project, making the money available to the grantee or administering agency for expenditure.

35. I.e. three months after the end of the fiscal year for which they were appropriated. 31 U.S.C. § 701(a)(2) and (b).

36. In opposition to the Motion for Temporary Restraining Order herein. Defendants argued the equitable defense of laches, contending that Plaintiffs should bear the loss resulting from Plaintiffs' failure to file this action until the fiscal year had ended. In response Plaintiffs indicated that they had been affirmatively misled by the Office of Education as to the amount of funding Congress had made available for the programs here in dispute, had thereafter engaged in extended discussions with Defendants and their coun-

sel, and had relied on the continued availability of the funds by virtue of the Tydings Amendment (See IIa, supra) until defense counsel indicated that Defendants would contest Plaintiffs position on the effect of that provision also. The Court finds no laches.

37. 31 U.S.C. § 701(a)(2):
   Upon the expiration of the period of availability for obligation, the unobligated balance shall be withdrawn and, if the appropriation was derived in whole or in part from the general fund, shall revert to such fund . . ., provided, that when it is determined necessary by the head of the agency concerned that a portion of the unobligated balance withdrawn is required to liquidate obligations and effect adjustments, such portions of the unobligated balance may be restored to the appropriate accounts.

tion is necessary "to liquidate obligations and effect adjustments." Thus reversion is not absolute, but is subject to some discretion by agency heads in post-reversion "restoration" of accounts. This Court cannot accept Defendants' argument that an agency head can reach and restore reverted funds but that the Federal judiciary cannot.

Defendants acknowledge that the "legislative history makes clear that this (proviso) was intended to apply . . . where an obligation has already been recorded and where an adjustment must be made as to the amount."[38] In the present case obligations of $37,900,000 [39] were recorded when the amount should have been $53 million. This Court finds that the proviso of 31 U.S.C. § 701(a)(2) indicates that funds are available to require "Adjustment" of the obligated amount up to $53 million. The Court finds no inconsistency between this result and the legislative history of Section 701.[40] Adjustments were to be made to correct errors, underestimates, and the like, which resulted in the recording of an obligation at an amount

less than it should have been. In the present case, the Commissioner of Education made an error of law as to the extent of his discretion in limiting funding for non-program reasons. That error is likewise subject to correction by adjustment.[41] More importantly, the proviso is significant here as an indication that reversion is not an absolute bar to reaching funds after the fiscal year. Once it is determined that the funds can be reached it is the power of the Court, rather than the operation of the proviso, which will effect their restoration.

There is a second problem with Defendants' argument of reversion by virtue of Section 701 of the Budget and Accounting Act. The language of the section provides that any unobligated balance "shall be withdrawn and shall revert." Defendants argue that reversion occurred automatically on June 30, 1973. Yet, it is not clear from the statutory language, nor from the legislative history,[42] whether withdrawal and reversion are independent functions or were intended as sequential functions, i. e. re-

---

38. Defendants' Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment, at 17.

39. See note 3, supra. This is Defendants' figure as to the amount actually obligated. Plaintiffs initially contended that only $33 million had been obligated, but they have not disputed Defendants' figures.

40. H.R.Rep.No.2015, S.Rep.No.2266, Conf. Rep.No.2726, 84th Cong 2d Sess (1956). (1956 U.S.Code Cong. & Admin.News, p. 3520). Both House and Senate Reports indicate that the proviso was suggested by the Defense Department to allow adjustments in obligated balances due to price redeterminations, escalation clauses in contracts and the like. Senate Rep. at 2, 4–5, and 7. House Rep. at 5.

41. That Congress might have not foreseen the application of the proviso to an impoundment situation is no bar, see Eastern Air Lines, Inc. v. C.A.B., 122 U.S.App.D.C. 375, 354 F.2d 507, 511 (1965), for executive impoundments of present proportions were unheard of at the time the statute was enacted.

Defendants further argue that contrary findings were made by several other judges of this Court in a series of cases in which interlocutory injunctive relief was granted in late June 1973 to forestall any possibility of reversion of funds in pending impoundment cases. Civil Action Nos. 1244–73, 1316–73, and 1125–73. One of these cases, Civil Action no. 1125–73, was brought by the present Plaintiffs. There are several answers to this argument. First of all, these decisions are not binding on this Court. Secondly, there were in each case findings on preliminary relief only, not final determinations on the merits. Thirdly, there is no indication that in any of these cases the question of reversion was disputed, argued, briefed and decided by the Court on the merits. Indeed, it appears that the issue was not disputed at all in any of the cases. With regard to the present Plaintiffs, they concede that they did not dispute the reversion date in prior cases because a) it was unnecessary in those cases and b) they were therefore unaware of the arguments available to them. This Court finds no estoppel.

42. Note 40, supra.

version would not occur until withdrawal was accomplished.[43] In the present case, there was never a formal withdrawal of the disputed funds because withdrawal was barred by the Temporary Restraining Order entered herein September 28, 1973, and subsequent Preliminary Injunction. If reversion does not occur until after withdrawal, no reversion of funds herein has yet occurred. The Court deems it unnecessary to pursue this avenue further, however, in light of the result reached above.

■ Defendants final contention is that even if the disputed funds have not reverted to the Treasury, nevertheless, the authority of Defendants to obligate the funds expired on June 30, 1973. There are several answers to this. First of all, it can well be said that Defendants are to "adjust" an outstanding obligation, which they concede is possible,[44] rather then to issue a new obligation. Secondly, the equitable power of the Federal Courts is broad, and it is a well-established prerogative of the Court to treat as done that which should have been done.[45] Here the Court has found that the funds should have been obligated in FY 1973. The statutory specifications of authority to obligate Federal funds define and limit Defendants' standard operating authority, but do not purport to circumscribe the powers of the Federal Courts to provide appropriate relief when the disputed funds are found to be available.

Plaintiffs' motion for summary judgment will be granted, Defendants' cross-motion will be denied. Defendants will be ordered 1) to apportion to the States all funds appropriated by Congress for Titles V-A and V-C of the Elementary and Secondary Education Act for Fiscal Year 1973, not heretofore apportioned; 2) to notify the States of such apportionment and of the fact that applications for grant awards of these funds will be accepted for a reasonable period; 3) to accept, review, and approve or disapprove for program-related reasons, applications from the States for grant-awards of these funds; 4) to take prompt and appropriate steps to implement disbursement of funds to successful grant-award applicants, all in accord with standards and procedures generally applicable prior to the impoundment of funds challenged herein.

■ Defendants have opposed certification of this case as a class action on the grounds that the number of potential plaintiffs is not so large as to make joinder of all members impracticable. This Court expressly finds that such joinder would be impracticable, that the other prerequisites of Rule 23(a), Federal Rules of Civil Procedure, have been met and that Defendants have acted or refused to act on grounds generally applicable to the class, Rule 23(b)(2) and that the motion to certify a class action on behalf of all the states and the District of Columbia should be granted.

Counsel for Plaintiffs is to submit appropriate Orders within ten (10) days of date.

43. The introductory words of 701(a)(2) ("Upon the expiration of the period of availability . . .") might be seen as applying separately to the "shall be withdrawn" and "shall revert" language, indicating that each function takes place simultaneously at the expiration of the fiscal year. Yet subsection (b) expressly contemplates that the withdrawal of funds required by subsection (a) need *not* be simultaneous with the expiration of the fiscal year. Thus there is no definitive indication at all as to when withdrawal or reversion occur under § 701(a)(2).

44. Note 38, supra.

45. Niagara Mohawk Power Corp. v. F.P.C., 126 U.S.App.D.C. 376, 379 F.2d 153 (1967); Butler v. Atwood, 369 F.2d 811 (6th Cir. 1966); United States v. Roadway Exp., Inc., 457 F.2d 854 (6th Cir. 1972).