**CITY OF LOS ANGELES, Plaintiff,**

**v.**

**Hon. William T. COLEMAN, Jr., Secretary of Transportation of the United States, et al., Defendants.**

**Civ. A. No. 75–0679.**

United States District Court, District of Columbia.

June 23, 1975.

548

Charles S. Rhyne, William S. Rhyne, Donald A. Carr, Richard J. Bacigalupo, Rhyne & Rhyne, Washington, D. C., Burt Pines, City Atty., Milton N. Sherman, Chief Asst. City Atty., Lawrence M. Nagin, Sp. Counsel to the City Atty., Ronald J. Einboden, Deputy City Atty., City of Los Angeles, Los Angeles, Cal., for plaintiff.

John R. Harrison, Asst. Chief Counsel, Litigation Div., FAA, Washington, D. C., Earl J. Silbert, U. S. Atty., Ellen Lee Park, Eric B. Marcy, Asst. U. S. Attys., Washington, D. C., for defendants.

## MEMORANDUM OPINION

PARKER, District Judge.

The dispute in this case centers around whether on not the plaintiff City of Los Angeles is entitled to $9,585,000 for airport development under the Airport and Airway Development Act of 1970, 49 U.S.C.A. § 1701 *et seq.* (1970) (the Act). The defendants are the Secretary of Transportation, the Acting Administrator of the Federal Aviation Administration, the Secretary of the Treasury and the Director of the Office of Management and Budget, who are charged with the responsibility of dis-

tributing the funds authorized by the Act. This Court on May 2, 1975, granted a Temporary Restraining Order which prohibited the federal defendants from obligating to anyone other than plaintiff the disputed $9,585,000. On May 14, 1975, while the restraining order was still in effect, the Court entered an order granting a preliminary injunction based on its Findings of Fact and Conclusions of Law, which had the effect of holding the funds intact *pendente lite.*

At issue before the Court is whether plaintiff is entitled to a grant-in-aid in the amount of $9,585,000 which represents the sum which has been apportioned to plaintiff under the Act for fiscal years 1974 and 1975. The plaintiff is basically seeking three types of relief in this lawsuit: (1) a permanent injunction restraining defendants from obligating any portion of the $9,585,000 apportioned to plaintiff under the Act to any airport sponsor other than plaintiff; (2) a declaratory judgment to the effect that the actions of the defendants were in violation of the law; (3) relief in the nature of mandamus by issuance of a writ commanding defendants to immediately process plaintiff's project application and to obligate prior to June 30, 1975 the funds due plaintiff under the Act. The defendants contend that there are not enough funds available to obligate to all sponsors the amounts which have been apportioned to them under the statute and that therefore a priority system was instituted under which plaintiff would not be able to receive the funds it seeks. By agreement between counsel, the matter was heard on the merits on June 10 and 11, 1975.

The Court has reviewed and considered the testimony, the affidavits, exhibits* and the memoranda and oral arguments of counsel, and concludes that plaintiff should be granted the injunctive, declaratory and mandamus relief requested.

### The Statutory Scheme

The Airport and Airway Development Act of 1970 was declared by Congress to be a vehicle for expanding and improving the nation's airport and airway system. 49 U.S.C.A. § 1701. The preamble of the Act outlines a 10 year program from 1970 to 1980 with an authorization for grants totalling $2,500,000,-000. *Id.* The operative sections of the Act, however, provide specific authority for the obligation of funds only until June 30, 1975. 49 U.S.C.A. § 1714(b). No funds can be obligated after that date unless Congress passes new legislation.

The Federal Aviation Agency (FAA) under the direction of the Secretary of Transportation is in charge of administering airport development funds. An Airport and Airway Trust Fund was established in the United States Treasury, with revenues from various taxes on aviation activities, for the purpose of meeting obligations incurred under the Act. 49 U.S.C.A. § 1742. $193,000,-000 in funds authorized to be, but not, obligated in prior fiscal years remain in the Trust Fund at the present time.

The Act specifies certain minimum yearly amounts for airport development projects on a nationwide basis. For fiscal years 1971–73 the amount was $280,-000,000 per year and for fiscal years 1974–75 it was $310,000,000. 49 U.S.C.A. § 1714(a)(1) and (2). The total amount authorized for each year is to be apportioned by the Secretary in accordance with the following formula:[1] (1) ⅓ to the States on the basis of population and area; (2) ⅓ to sponsors of air-

---

* *See* List of Exhibits Admitted, Appendix A.

1. A different formula applies to a small portion of the total minimum authorization ($30,-000,000 for fiscal years 1971 through 1973, and $35,000,000 for fiscal years 1974 and 1975), which are used for airports serving segments of aviation other than air carriers certificated by the Civil Aeronautics Board. The enplanement formula does not apply to these funds. 49 U.S.C. § 1715(a)(2).

ports served by air carriers certificated by the Civil Aeronautics Board[2] in the same ratio as the number of passengers enplaned at each airport of the sponsor bears to the total number of passengers enplaned at all such airports (enplanement formula); and (3) ⅓ to be distributed at the discretion of the Secretary. 49 U.S.C.A. § 1715(a)(1). The amounts apportioned according to the enplanement formula are to remain available to the designated airport sponsors for approved airport development projects for the fiscal year in which apportioned and for the next two fiscal years. After that time, the Secretary of Transportation is given discretion to distribute these funds as he sees fit. 49 U.S.C.A. § 1715(a)(3).

### The Facts

Plaintiff City of Los Angeles is a California municipal corporation which, through its Board of Airport Commissioners, owns and operates the Los Angeles International Airport. Plaintiff's airport is served by air carriers certificated by the Civil Aeronautics Board, and therefore is entitled to have funds apportioned to it under the Act's enplanement formula.

On September 5, 1973, the FAA and the Department of Transportation announced the apportionment of the 310 million dollars authorized for fiscal year 1974 under the Act. The share apportioned to the City of Los Angeles was $5,694,301.[3] Similarly, on August 14, 1974, the FAA and the Department of Transportation announced the apportionment to Los Angeles of $5,377,597, its enplanement entitlement for fiscal

year 1975.[4] Plaintiff has received grants for airport development of considerably less than the apportioned amounts for fiscal years 1974 and 1975. Plaintiff's remaining apportioned share of funds under the enplanement formula is $9,585,000, a sum acknowledged as accurate by both sides.[5]

Plaintiff City of Los Angeles committed itself to projects involving land acquisition in 1974 and 1975 in reliance on receiving funds under the enplanement formula of the Act. Accordingly, Los Angeles timely and properly applied for a grant under the Act in October of 1974,[6] but was told by FAA officials in March of this year that it would not be approved because no funds were available and that plaintiff's project was of an insufficiently high priority under the FAA's priority system of rating airport projects.

### FAA's Priority System and the "Limitation" of § 302

Defendants seek to justify their refusal to obligate to Los Angeles its 1974 and 1975 entitlement by claiming that there are insufficient funds available to satisfy all the demands for monies apportioned under the statute. As a result of this shortage, defendants have set up their own "priority system" for approving airport grants, rather than strictly abiding by the mandatory formula set forth in § 1715 of the Act. Three factors are offered to justify the establishment of the "priority system"; (1) the yearly limitation of the Appropriations Acts; (2) the duty to spend the full amount authorized each year by § 1714; and (3) the inability of

---

2. There are approximately 468 such airport sponsors to whom funds have been apportioned each year by the Secretary of Transportation and the FAA. The annual apportionment is usually announced in a news letter at the beginning of the fiscal year. It is then up to the individual sponsors to submit applications for the apportioned funds.

3. Dep't of Transportation News, No. 73–154, attached summary of apportionment at 4.

4. Dep't of Transportation News, No. 74–124, attached summary of apportionment at 4.

5. The parties had arrived at slightly different figures for plaintiff's remaining enplanement funds but they agreed in open court that $9,585,000 was a reasonably accurate figure.

6. Plaintiff's project substantially meets the requirements of project eligibility as required by FAA regulations, with the possible exception of a few minor details, discussed *infra*, at page 557.

smaller airports to finance average projects on their statutory enplanement funds alone.

Although §§ 1714 and 1715 of the Airport Act set forth minimum yearly enplanement entitlements which are to remain available to airport sponsors for three years, defendants argue that they cannot obligate all of the money authorized by the Act because of § 302 of the Appropriations Act for fiscal year 1975, which reads as follows:

> None of the funds provided in this Act shall be available for administrative expenses in connection with commitments for grants-in-aid for airport development aggregating more than $310,000,000 in fiscal year 1975. Pub. L. 93–391, § 302 (1974).

Defendants have interpreted this language as imposing a ceiling on the amount of money which can be obligated under the Airport Act in any given year,[7] despite the minimum authorizations which were supposed to have accumulated. Indeed, the defendants admit that because less than the full authorizations have been obligated, 193.7 million dollars in enplanement, state and discretionary balances will remain opportioned but unobligated after the June 30, 1975 cut-off date.

The appropriation statute does not limit obligational authority directly, but defendants argue that by prohibiting the expenditure of funds to *administer* grants-in-aid over a certain amount, Congress has indirectly put a ceiling on the amount of money that can be obligated. Since the FAA could not approve a grant without incurring some administrative expenses[8] in connection with reviewing and processing the application, the limit on expenses is in effect a limit on grants. The FAA has been acting in accordance with this interpretation of the appropriation "ceiling" throughout the existence of the Airport Act.[9]

The FAA's use of discretion is also defended as a solution to the "dilemma" posed by the command of § 1714 to obligate "not less than" specific amounts each year, and the provisions of § 1715 that funds are to be apportioned by formula to airport sponsors and states and remain available for three years. Thus, since not every airport sponsor will apply for all of its enplanement money in very year, the FAA claims it must use discretion to approve some projects which use more than one year's enplanement balance, rather than reserving each sponsor's apportionment for the entire year, in order to obey the § 1714 mandate to spend not less than the amount of the current year's authorization.

A third basis for the priority system stems from the fact that only a minority of airports could finance an average project out of their enplanement balances alone. Under the priority system, some airports could receive grants which were taken from enplanement, state and discretionary funds, even though other airports have a larger amount of enplanement monies apportioned but unobligated. The enplanement entitlements of all airport sponsors are preserved in the FAA's accounting records, however, and are always debited first when a grant is approved.

---

7. An equivalent section has appeared in every appropriations act passed during the existence of the Airport and Airway Development Act. with amounts averaging at or near the minimums authorized for that fiscal year in § 1714 of the Act. *See*: Pub.L. 92–74 § 303 (1971) ($280,000,000 for FY 1972); Pub.L. 92–398 § 302 (1972) ($280,000,000 for FY 1973); Pub.L. 93–98 § 302 (1973) ($300,000,000 for FY 1974).

8. Administrative expenses or costs are basically the salaries of agency personnel who review grant applications.

9. In the first year of the Act, however, the Department of Transportation obligated considerably less than both the minimum statutory amount and the "ceiling" in the Appropriations Act. *See* H.R.Rep. 92–459, 92d Cong., 1st Sess. 3 (1971), U.S.Code Cong. & Admin.News 1971, p. 1797.

This "priority system", necessitated by the FAA's refusal to spend more than the amount specified in the Appropriations Act, resulted in the backlogging of statutory entitlements, with some sponsors receiving grants encompassing up to three years of apportioned funds, whereas other sponsors applying for their current year's apportionment were put off for another year. The criteria used for determining which projects would be funded in a given year were detailed and technical, but apparently no priority was given to airport sponsors who had a definite amount of statutory enplanement money on the books. FAA officials appeared to have a goal of placing under grant all acceptable projects whose sponsors had statutory entitlements pending, but because of the "ceiling" contained in the Appropriations Act, grants were often postponed. There was some speculation that Los Angeles would receive its grant in fiscal 1976 were it not for the prohibition on obligations after June 30, 1975.

Thus, defendants argue, the priority system is the administration's response to the dilemma posed by conflicting Congressional mandates—it is not a frustration of Congressional will, but represents the best efforts of the defendants to carry out the purpose of the Airport and Airway Development Act.

### Impoundment Doctrine

■ Los Angeles contends that the FAA's priority system is a violation of the statute, and that the withholding of plaintiff's enplanement funds is the equivalent of executive impoundment, or refusal to spend, money appropriated by Congress. The series of impoundment cases decided by federal courts in recent years supports the proposition that the administration has no inherent discretionary power to refuse to make grants to persons who are entitled to them by the terms of a mandatory Congressional statute.

*State Highway Commission of Missouri v. Volpe,* 479 F.2d 1099 (8th Cir. 1973), involved impoundment of funds under the Federal-Aid Highway Act of 1956. In the Highway Act, certain user taxes were set aside in a trust fund, out of which the administration was required to apportion certain amounts authorized for appropriation to the states in accordance with a specific formula. After the amounts were apportioned, states submitted proposed projects based on their apportioned share. The funds were to remain available to the states for a period of three years. In 1966, President Johnson limited the amounts which could be spent on the highway programs for budgetary reasons. The result was that although 115.7 million dollars had been apportioned to the Missouri Highway Commission, 21.9 million dollars of that sum was impounded by the Secretary of Transportation.

The Eighth Circuit held that the Secretary could not withhold approval of state highway projects "for reasons not contemplated within the Act." *Id.* at 1110. The Department of Transportation had no discretion to withhold approval of projects because of its own "system of priorities" which was not in furtherance of the Act.

*Train v. City of New York,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975), is a similar case upholding mandatory expenditure if provided by statute and denying administrative authority to choose not to spend. The *Train* case was concerned with the Federal Water Pollution Control Act Amendments of 1972, which provided for annual sums "authorized to be appropriated" for sewage treatment projects. The yearly sums were to be allotted to the states, and localities would in turn submit applications to the Administrator of the Environmental Protection Agency for grants from the state allotments. In 1972 President Nixon instructed the Administrator *not* to allot the full amounts authorized. This impoundment was found to be in direct contravention of the will of Congress. The statute when read in conjunction with its legislative

history, manifested a Congressional intent "to create a procedure which would insure that the total authorized funds would be made available to the states." *City of New York v. Train,* 161 U.S. App.D.C. 114, 494 F.2d 1033, 1042 (1974), *aff'd,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975). Such Congressional intent was held to prevail over any administrative decision to the contrary.

Finally, in *Pennsylvania v. Weinberger,* 367 F.Supp. 1378 (D.D.C.1973), Judge Robinson of this Court construed the provisions of Title V of the Elementary and Secondary Education Act of 1965. Under the Education Act, Congress appropriated funds each year, and the Commissioner of Education was required to apportion these funds according to a formula to the states, who would in turn apply for grants up to the amount of their respective apportionments. Pursuant to a related statute, funds appropriated would "remain available for obligation and expenditure until the end of such fiscal year."[10] Judge Robinson interpreted this provision as denying to the administration any authority to refuse to approve a state application for apportioned funds for other than "program-related" reasons. *Id.* at 1382. *See also: Sioux Valley Empire Electric Association, Inc. v. Butz,* 504 F.2d 168 (8th Cir. 1974) (Secretary of Agriculture could not terminate Rural Electrification Act loan program as part of an effort to hold down the overall federal budget); *Guadamuz v. Ash,* 368 F.Supp. 1233 (D.D.C.1973) (administration could not terminate or withhold appropriated funds for federal soil conservation and housing rehabilitation subsidy programs for fiscal policy reasons collateral to the purpose of the statutes); *Local 2677, American Federation of Government Employees v. Phillips,* 358 F.Supp. 60 (D.D.C.1973) (Acting Director did not have authority to halt the OEO program for

reasons unrelated to the purposes of the Economic Opportunity Act).

Defendants argue that the impoundment cases are not controlling because the denial of funds to Los Angeles is the result of a priority system designed to carry out the purposes of the Airport and Airway Development Act. Thus, the withholding of funds was for "program-related" reasons, as opposed to the collateral budgetary motives which were involved in the majority of the impoundment cases. Indeed, defendants assert that the administration can terminate an entire program if such action is in harmony with the purposes of the authorizing statute. In support of their position, defendants rely principally on *Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 501 F.2d 848 (1974). In that case the Secretary of Housing and Urban Development had suspended certain low income housing programs in order to investigate whether certain abuses in their operation were producing results exactly contrary to the original Congressional purpose in authorizing the federal subsidies. The Court of Appeals noted that the Secretary had suspended the programs for "program-related reasons", rather than because of concerns "such as fiscal policy—extrinsic to the operation of the programs." *Id.* at 852. Thus, the action of the Secertary was upheld against a challenge by certain organizations who would otherwise have been entitled to federal housing subsidies.

■ The situation presented in this case, however, is more closely analogous to the *Volpe, Train,* and *Weinberger* cases than to the *Lynn* case. The Airport and Airway Development Act set up a mandatory program for grants-in-aid to airports, with specific yearly amounts to be apportioned to airport sponsors according to a non-discretionary formula. Defendants have refused to obligate to Los Angeles the amount

---

10. Section 415 of the General Education Provisions Act, 20 U.S.C. § 1226, quoted in 367 F. Supp. at 1381.

apportioned to it, claiming that § 302 of the Appropriation Act set up a limitation which compelled the Secretary of Transportation to establish the priority system which was used to deny Los Angeles' application for its apportionment. Defendants' withholding of funds is not specifically related to the purpose of the 1970 Act, however, but depends entirely on the defendants' interpretation of § 302 of the annual Appropriations Act. Such an interpretation is a question of law and the administration's theory cannot prevail if the court finds from an examination of the language of the statute and the legislative history that the intent of Congress was to the contrary. *See Bailey v. Romney,* 359 F.Supp. 596, 601 (D.D.C.1972).

### The Intent of Congress

■ Defendants presented evidence regarding the existence and operation of their "priority system" in the belief that it presented a question of fact. Contrary to the defendants' contentions, however, the Court finds that there is no real dispute as to the existence of the priority system, or the details of its operation. The real issue is whether defendants' established procedures in this regard are in accord with the will of Congress as reflected in the Airport Act and the Appropriations Acts. While the priority system may reveal that the administrative agency has been interpreting the Congressional mandate in a certain restrictive manner for a number of years, such an interpretation is not controlling. The Court must determine for itself the intent of Congress by an independent examination of the pertinent legislative history and the language of the statutes themselves.

### 1. Legislative History

■ One important goal of the 1970 Act was the facilitation of long-term planning by airport sponsors. The mandatory apportionment formula with funds to remain available for three years

was intended to remedy the uncertainties of funding which had existed under the Federal Airport Act of 1946.[11] The Senate Report on the 1970 Act stated specifically that the new formula method would avoid some problems of past funding:

> The vagaries of year to year general appropriations coupled with the fact that grant recipients were generally chosen on a year-to-year basis, and could never rely upon any certain level of Federal assistance, in effect, rendered Federal grants under the program less effective than is now necessary. S.Rep. No. 91–565, 91st Cong., 1st Sess. 22 (1969).

The apportionment formula was intended to assure that airport sponsors "will receive a guaranteed level of airport assistance grants each year providing those communities' project applications are approved." *Id.* at 28. The enplanement formula was deemed necessary to make sure that at least one-third of the user taxes in the Trust Fund would be used "in the airport areas of the highest traffic density and where the need is greatest." *Id.*

Thus, FAA's priority system, which would deny Los Angeles the mandatory enplanement funds upon which it had relied, would subvert the primary purpose of the Act's funding mechanism which was to provide minimum levels of assistance so that airport sponsors could make their plans with the assurance that their federal entitlement would be forthcoming.

Another manifestation of Congressional intent to facilitate long-term planning by airport sponsors was the provision of the Act that required apportioned funds to remain available for the airport sponsor for up to three years. 49 U.S.C.A. § 1715(a)(3). Congress emphasized that the full yearly minimum authorizations were to be spent, even if not obligated in the year of authorization, so that airport sponsors

---

11. 60 Stat. 170 (1946).

could rely on the fact that their enplanement funds would be held for them for the three year period provided in the Act, and not be allowed to lapse because the administration refused to spend the minimum authorized amount.

This concern of Congress is illustrated by the legislative history of the 1971 amendments to the Act, which put restrictions on the use of the Trust Fund, limiting it strictly to capital development projects and those expenses necessary to administer the grants. 49 U.S.C.A. § 1714(e)(3). The impetus for this amendment was the Department of Transportation's budget request of less than the minimum authorized amounts in the first year of the Act. Members of Congress were concerned that the Department apparently intended to employ the residual balance of Trust Fund monies for FAA operational and maintenance expenses rather than for airport development.[12]

The Congressional reports refer to the retention of tax money in the Trust Fund "until used" for development,[13] to thus "accumulate user revenues to be employed in the capital development program."[14] During floor debate, supporters of the bill spoke of maintaining "the sanctity of the trust fund"[15] which "must be preserved in order to meet the captial requirements of the aviation system."[16] These statements imply that Trust Fund monies are to remain available for obligation after the original authorization, contrary to the argument of the defendants that the Appropriations Acts limited the Department of Transportation's annual obligational authority to a sum not exceeding the current year's minimum authorization.

In opposing the 1971 Amendments, the Department itself argued that since the Act authorizes expenditures over a period of 10 years, it would "speed up" grants in later years to compensate for the shortfall which occurred during the first year of the Act.[17] At a hearing on the amendments, a representative of the Department of Transportation indicated that the "balance of 403 million dollars in the trust fund at the end of fiscal year 1971 . . . will be completely eliminated during fiscal year 1972 as the proper adjustment is made to balance out the 2-year period."[18] These statements were made despite the fact that the Appropriations Act for each year of the existence of the Airport and Airway Development Act had contained almost identical language[19] which the Department now claims precludes them from using Trust Fund money to fulfill statutory entitlements from prior years.

2. Language of the Statutes

■ As discussed above,[20] defendants' refusal to obligate to Los Angeles its enplanement entitlement is based on their interpretation of § 302 of the Appropriations Act as a limitation on the amount of money that can be obligated in any given year. If this yearly Appropriations Act is construed to impose a limit on the minimum amounts previously authorized to be obligated, however, then the Appropriations Act would effectively repeal some part of the original statute which authorized a higher level of funding. Courts should

---

12. S.Rep. 92–378, 92nd Cong., 1st Sess. 4–5 (1971); H.R.Rep. 92–459, 92nd Cong., 1st Sess. 3 (1971).

13. S.Rep. 92–378, *supra* n. 12 at 3.

14. *Id.* at 4; H.R.Rep. 92–459, *supra* n. 12.

15. 117 Cong.Rec. 32733 (1971) (remarks of Representative Jarman).

16. 117 Cong.Rec. 35729 (1971) (remarks of Senator Pearson).

17. S.Rep. 92–378, *supra* n. 12 at 5; H.R. Rep. 92–459, *supra* n. 12 at 4.

18. Olsson, Deputy Under Secretary of Transportation, quoted in 117 Cong.Rec. 32735 (1971).

19. *See* note 3, *supra*.

20. *See* discussion at pages 550–551, *supra*.

not uphold such a repeal by implication if the two statutes can be interpreted in a consistent manner. *United States v. Borden Co.*, 308 U.S. 188, 198-9, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

■ The provisions of the Airport and Airway Development Act for mandatory minimum authorizations to remain available for a period of three years can be readily reconciled with § 302 of the Appropriations Act. The language of § 302 limits FAA "administrative expenses" but does not directly purport to put a limitation on the previously established obligational authority. Interpreting § 302 as a limitation on administrative expenses, rather than obligational authority, is also consistent with the purpose expressed in the legislative history of the 1971 amendments to preserve the trust fund for distribution to airport projects and to prevent the FAA from using it to pay for general expenses which were not connected with airport and airway development.

Defendants' interpretation of § 302, on the other hand, would contradict the statutory format providing that the minimum amounts apportioned each year may accumulate for up to three years. Under defendants' interpretation, there would never be enough funds available for all airport sponsors to get their current apportionments plus any backlog that may have accumulated from prior years. Defendants admit that enough money is currently in the Trust Fund with which to obligate to Los Angeles its statutory entitlement. It would thus be illogical for Congress to pass a limitation on yearly obligational authority with the result that some 193 million dollars is left frozen in the Trust Fund with no way for the FAA to distribute it to sponsors who are entitled to the funds under the statute. Furthermore, if Congress had intended to put a limitation on yearly expenditures previously authorized, it could have done so straight forwardly through an amendment, rather than changing the statutory funding scheme through an ambiguous section of an appropriations act. In fact, Congress *increased* obligational authority by amending § 1714 in 1973,[21] which indicates that Congress could likewise have *decreased* obligational authority by amendment to the Airport Act.

The obligation power comes from the 1970 Act itself and its amendments increasing the authorized amounts. The Appropriations Act does not alter the obligation power in any way but rather serves to limit FAA administrative expenses. This interpretation resolves the "paradox" which defendants have argued was created by Congress, and it is also consistent with the clear intent of Congress in establishing annual apportionments of minimum amounts with a three year carryover provision. Thus, FAA now has the power and the duty to obligate to Los Angeles the $9,585,000 to which it is entitled under the Airport and Airway Development Act.

*Conclusion*

This Court concludes that Los Angeles is entitled to a grant in the amount of the unobligated balance of the funds apportioned to it by the Department of Transportation and the FAA for fiscal years 1974 and 1975. The statute provides for a mandatory formula for distribution of grants-in-aid, and the FAA's priority system is in direct contravention of the controlling legislation. The Appropriations Act is not in conflict with the Airport Act and does not justify the withholding of the enplanement funds to which Los Angeles is entitled.

Although plaintiff's application has *substantially* met the requirements of project eligibility as required by FAA regulations, it became apparent at the June 10th hearing in this matter that no final determination had yet been made of the project's compliance with the National Environmental Policy Act of 1969[22] or the Uniform Relocation As-

21. Pub.L. No. 93-44 (1973).

22. 42 U.S.C. § 4321 *et seq.*

sistance and Real Property Acquisition Policies Act of 1970.[23] It appeared to the Court from the testimony, however, that only a few minor details remained before Los Angeles would have made a complete submission to the agency. This Court's order in favor of plaintiff Los Angeles is therefore conditional upon compliance with the requirements of the above statutes. The FAA will also be required to review forthwith any submissions of plaintiff Los Angeles so that the funds may be obligated to Los Angeles before June 30, 1975.

It is hereby this 23rd day of June, 1975

Ordered that counsel for plaintiff shall submit forthwith an Order consistent with the foregoing Memorandum Opinion.

### APPENDIX A
### List of Exhibits Admitted

*Defendants' Exhibits:*

*A through E*—FAA annual reports to Congress for fiscal years 1970 to 1974, mentioning the use of the priority system for airport grants.

*F*—FAA internal explanation of the priority system.

*G*—FAA calculations showing the unapportioned enplanement balance designated for Los Angeles.

*H*—October 10, 1974 notice to Los Angeles that it was eligible to submit an application.

*M and M–1*—Department of Transportation and FAA newsletters announcing nationwide apportionments for fiscal years 1974 and 1975.

*S and T*—Letters from the FAA to Los Angeles in May, 1975, informing Los Angeles of deficiencies in its application with regard to environmental and relocation requirements.

*Plaintiff's Exhibits:*

*1*—Letter from the Environmental Protection Agency to the FAA to the effect that EPA had no objections to the Los Angeles project.

*2*—Affidavit of Los Angeles Airport employee and attached documentation showing compliance with the relocation requirements.

*3*—Supplement to Los Angeles' environmental impact statement designed to answer the remaining questions of the FAA.