Robert W. KELLEY et al. and Henry C. Maxwell et al.

v.

METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, et al.

v.

Caspar W. WEINBERGER, Secretary, United States Department of Health, Education, and Welfare, et al.

Civ. Nos. 2094, 2956.

United States District Court,
M. D. Tennessee,
Nashville Division.

Dec. 19, 1973.

## MEMORANDUM AND ORDER

FRANK GRAY, Jr., Chief Judge.

In a Memorandum and Order entered in this third party action on February 23, 1973, 372 F.Supp. 528, the court held that federal jurisdiction would lie to determine the legality, under the applicable statutes and the Constitution, of the actions of certain federal officers named as third party defendants in this suit. The case is now before the court for a decision on the merits.

Inasmuch as the court has previously set forth the background of this case in the February 23rd Memorandum, a brief summary of the case will suffice here.

The roots of the action *sub judice* can be traced directly to the desegregation order entered by this court on July 15,

1971, in the Nashville desegregation case, Kelley v. Metropolitan County Board of Education of Nashville, Tennessee.[1] On that date, the Honorable L. Clure Morton, United States District Judge, ordered the implementation of a plan for the desegregation of the Nashville public schools. That plan was drawn under the guidelines set forth in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and provided, *inter alia,* for increased busing in the Nashville school system. It appears proper to note that this plan was originally submitted to the court by the United States Department of Health, Education, and Welfare. These busing provisions of the plan became the center of a divisive public controversy, a flame ignited by opposition to integration in general and fanned by "official" reaction to the busing issue.

One of the principal reasons for the intensity and duration of the busing controversy in Nashville was the intolerable situation which developed when the Metropolitan Board of Education began operation under the desegregation plan. It did not have enough buses to meet the expanded busing requirements of the desegregation plan; its requests to local and federal authorities for funds with which to buy the needed buses were rejected. As a consequence, the school board was forced to resort to scheduling practices that endangered the health and welfare of a substantial number of school children. These dangerous conditions and the enormity of the inconvenience resulting from such scheduling, all caused by the refusal of governmental authorities to provide the funds needed to purchase additional buses, greatly intensified and prolonged the busing controversy to the extent that the goal of

the plan was obscured and effective desegregation of the Nashville schools was drastically impeded.

For their contribution to the public furor surrounding implementation of the desegregation plan, certain local government officials were joined as defendants in the desegregation case on August 19, 1972, upon a finding by this court that they had acted so as to impede the effective implementation of the plan. For their alleged partial responsibility for the Nashville busing crisis, the federal officers were sued in the third party action now before the court.

This action was commenced shortly after the Metropolitan Government of Nashville, Tennessee, the Mayor, and members of the City Council were joined as defendants in the desegregation case. The third party plaintiffs are three black members of the City Council who are suing as councilmen and as parents of children attending the Nashville public schools.[2] The third party defendants are those federal officers responsible for the administration of certain federal programs, cited *infra,* established and funded by Congress for the purpose of providing emergency assistance to local school districts undergoing desegregation, either voluntarily or under court order.

The federal programs under which the Metropolitan Board of Education submitted its requests for busing funds began in the 1970–71 school year. Under the section entitled "Emergency School Assistance" in the Office of Education Appropriations Act of 1971 (P.L. 91–380), Congress provided for assistance to desegregating local educational agencies by contributing to the costs of "new or expanded activities" made necessary by desegregation.[3] The program that was

1. Affirmed, 463 F.2d 732 (6th Cir. 1972), certiorari denied, 409 U.S. 1001, 93 S.Ct. 322, 34 L.Ed.2d 262 (1973).

2. By Order entered December 13, 1973, the Metropolitan Board of Education was allowed to intervene as an additional third party plaintiff, pursuant to Rule 24(b) of the Federal Rules of Civil Procedure.

3. The statutory authority for this enactment was the following: Education Professions Development Act, 20 U.S.C. § 1119 et seq.; Cooperative Research Act, 20 U.S.C. §§ 331–332a; Elementary and Secondary Education Act, 20 U.S.C. § 887(c); Elementary and Secondary Education Amendments of 1967, 20 U.S.C. § 1222; Title II, Economic

fashioned to execute the provisions of that section was the Emergency School Assistance Program, ESAP.

ESAP awards were made to local school districts for the 1970–1971 school year pursuant to regulations promulgated by the Department of Health, Education, and Welfare. Under a continuing appropriations bill, Public Law 92–38, ESAP was extended through the 1971–1972 school year, and the Department published a new set of regulations for that year.[4] The program for 1970–1971 became known as ESAP–I, and the program for the 1971–1972 school year was designated ESAP–II.

As a replacement for ESAP, Congress enacted the Emergency School Aid Act (ESAA), Title VII of the Educational Amendments of 1972, 20 U.S.C. § 1601 et seq. This legislation is more comprehensive than its forerunner and extends the program to all regions of the nation. ESAA became effective on February 1, 1973, and will be in force until the end of fiscal year 1974.

The general premise of the action, as instituted, is the contention that the defendant federal officers shared the responsibility attributed by this court to the Board of Education, the Metropolitan Government, the Mayor, and the City Council, for obstructing the desegregation process. More specifically, the third party plaintiffs allege that the defendant federal officers, in the summer of 1971, adopted, in response to the initiative of President Nixon, a revised policy regarding the funding of transportation requests from local districts and that this new policy rules out the awarding of *any* federal funds for use by local school boards in transporting students between home and school. The third party plaintiffs further allege that the requests by the Nashville school board for transportation expenses under the federal programs have been denied pursuant to that new policy. It is claimed

that the challenged policy of the third party defendants and the denial of the local school board's transportation requests pursuant thereto were illegal as exceeding the powers granted by the applicable statutes and unconstitutional under the Due Process Clause of the Fifth Amendment.

In the face of the allegations contained in the third party complaint, the federal officers maintained that the court lacked jurisdiction to entertain this cause. This position was based on the following assertions: (1) the action was moot because appropriated funds were no longer available; (2) the third party plaintiffs lacked standing to bring the action; (3) the doctrine of sovereign immunity foreclosed such an action; (4) there was no jurisdictional statute under which the action could be brought; and (5) the third party plaintiffs had failed to state a claim upon which relief could be granted. In rejecting these contentions, this court, in the February 23rd Memorandum and Order, held: (1) the controversy between the parties, particularly with respect to what is obviously an ongoing policy, remains a "live" controversy because the programs in question are still in existence; (2) the third party plaintiffs have standing to maintain this action either because this is a third party action and the original plaintiffs could have joined the third party defendants in the original action or because the third party plaintiffs themselves, as councilmen and parents of Nashville public school students, meet the requirements of standing; (3) the doctrine of sovereign immunity is inapplicable because the instant suit, as pleaded, falls within the well-established exceptions to the doctrine; (4) subject matter jurisdiction was present under the Mandamus Act, 28 U.S.C. § 1361, and under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; and (5) therefore, the claim, if proven, was one upon

Opportunity Act of 1964, 42 U.S.C. § 2781 et seq. 45 C.F.R., part 181, § 181.2.

4. The new regulations, 45 C.F.R. § 181, were substantially similar to those which governed the previous year's program.

which this court could grant relief. Based on these conclusions of law, the court denied the third party defendants' motions for judgment on the pleadings and summary judgment, and the case was set for a hearing on the merits.

At the hearing, held July 7, 1973, the third party plaintiff called two witnesses, Dr. Elbert D. Brooks, Director of the Metropolitan Schools, and Dr. Charles Watts, Assistant Superintendent for Staff Development and coordinator for all funding programs, who described Nashville's attempts to obtain funds for busing under federal emergency assistance programs. The depositions of third party defendants Marland and Goldberg and those of Dr. John Lovegrove [Senior Program Officer (Atlanta Region), Equal Educational Opportunity, Office of Education] and Mrs. Polly B. McIntosh [Program Officer for Tennessee, Equal Educational Opportunity, Office of Education] also were received in evidence, together with several exhibits.

At the close of the plaintiff's case, the third party defendants moved for a directed verdict, arguing that the third party plaintiffs had failed to sustain their burden of proof. The court denied the motion, and, upon the Government's refusal to offer any proof, took the case under advisement. Both sides have submitted numerous briefs in support of their respective contentions, and these contentions pose and isolate t .e dispositive issues.

As noted, the third party plaintiffs have made essentially two principal contentions in this case: (1) that the third party defendants adopted and followed a policy flatly prohibiting the disbursement of federal emergency school assistance funds for transportation expenses; and (2) that this action was illegal under the laws of the United States and the Constitution. The third party defendants have taken the position that the third party plaintiffs have failed to prove the existence of such a policy and, moreover, that the actual policy with respect to transportation requests was one of placing a "low priority" thereon. In addition, the third party defendants contend that assigning a "low priority" to transportation requests, or even a "zero priority," was within their discretion under the applicable statutes.

Inasmuch as the other matters in dispute and the other arguments which have been raised during these proceedings are subsidiary to these contentions, two main issues thus remain to be resolved in this case, the factual issue concerning the policy, and the legal issue concerning the scope of discretion.

The court's discussion of the issues, assumes, for the purpose of argument, that a policy of merely placing a "low priority" on transportation requests would be within the permissible scope of that discretion imparted to the third party defendants by the Congress. It is necessary, therefore, to resolve the factual issue first.

## THE FACTUAL ISSUE

It is beyond dispute that, in administering the emergency school assistance programs, the third party defendants did give special treatment to requests for transportation funds. The factual issue at bar, therefore, is whether the special treatment was a policy of assigning a "low priority" to transportation requests, as the third party defendants allege, or a policy calling for an absolute prohibition against funding transportation requests, as contended by the third party plaintiffs.

Due to the nature and quantity of the evidence bearing on this issue, and because the great weight of the evidence requires the court to discredit crucial portions of the testimony of high government officers, the court deems it necessary to set forth its anaylsis of the evidence and its findings in rather detailed fashion. This analysis separates the evidence into three general areas, roughly categorized as follows: the evidence, essentially undisputed, which provides a brief history of the treatment of busing under the emergency assistance programs; the uncontroverted evidence as

to how the questioned policy was implemented; and the conflicting testimony concerning the nature and substance of that policy.

The chronological sequence of events which comprises the history of busing under the emergency assistance programs begins with the 1970–1971 school year, the first year the Emergency School Assistance Program was in operation. During that first year, or ESAP–I, grants were made to local school districts for the implementation of home to school busing activities.[5] Near the end of the 1970–1971 school year (April 20, 1971), the Supreme Court handed down its landmark decision in *Swann, supra,* holding *inter alia,* that busing was a permissible tool which could be used by federal courts in certain circumstances to achieve desegregation. Approximately three months later (July 15, 1971), this court, following the *Swann* guidelines, ordered the Metropolitan School Board to expand its busing activity as a part of an overall plan to desegregate the Nashville schools. School officials began to prepare their requests for ESAP assistance in buying additional buses shortly thereafter, and, pursuant to that endeavor, Drs. Brooks and Watts attended a meeting in Atlanta (July 28, 1971) for school superintendents of the region, at which Dr. Goldberg discussed the Emergency School Assistance Program. Being primarily concerned with assistance for busing, Dr. Brooks specifically asked Dr. Goldberg, on two different occasions, if emergency assistance funds were available for busing. Dr. Goldberg indicated that busing was an eligible activity and, in general, responded affirmatively.[6]

Two days after the Atlanta meeting, however, Dr. Goldberg issued a letter dealing with the third party defendants' policy with respect to busing requests under ESAP, purportedly as a result of a "recent policy clarification by the Department of Health, Education, and Welfare." In this letter, he said he had been asked to "emphasize" that transportation would receive a "very low funding priority" under ESAP. The letter said further that districts should request funds under ESAP for "direct educational purposes" (because such requests would receive the "highest priority") and were expected to look to State and local resources for transportation needs (Third Party Plaintiffs' Exhibit 1).

On the heels of Dr. Goldberg's policy letter came the announcement of the Nixon Administration's official position on the busing issue. On August 3, 1971, the White House released a "Statement by The President" on the issue of busing and school desegregation. First, President Nixon announced that, although the Government would appeal a District Court's decision in a Texas school desegregation case, it would not seek to enforce the HEW plan calling

---

5. Both Dr. Goldberg and Dr. Marland maintained that home-school busing grants were not made under ESAP–I (Goldberg deposition, p. 30; Marland deposition, p. 8); but the evidence preponderates overwhelmingly in favor of the conclusion that home-school busing grants were made under ESAP–I (Lovegrove deposition, pp. 5–7 and Ex. 1 to that deposition; McIntosh deposition, p. 8), and counsel for the third party defendants now concede the point, at p. 3, in the "Third Party Defendants' Opposition to Third Party Plaintiffs' Initial Brief on Facts," filed July 23, 1973. These grants were comparatively small, but this could be attributed, perhaps, to several reasons, not the least of which is the fact that the Swann decision had not yet been rendered by the Supreme Court.

6. There is considerable variance in the testimony on this point. Dr. Goldberg insists that, although he did give an affirmative response to the question (Goldberg deposition, p. 27), he qualified that response by saying that such an item would have a "lower priority" (*Id.*, p. 25). Mrs. McIntosh seems to remember hearing something at the Atlanta meeting about a "lower priority" in this connection, but was not sure whether she remembered that or whether she had "been hearing it somewhere" (McIntosh deposition, pp. 11–12, 13). Dr. Brooks and Dr. Watts, however, did not recall such a qualification and left the Atlanta meeting feeling more optimism and encouragement about busing assistance than they felt before. At the very least, the evidence supports the conclusion that Dr. Goldberg said that busing requests were eligible and could be funded.

for extensive busing and, in fact, would disavow that plan on appeal. Second, he re-stated his opposition to the busing of school children and said he had instructed the Attorney General and the Secretary of HEW to work with individual school districts to hold busing to "the minimum required by law." Third, he announced his instruction to the Secretary of HEW to submit to Congress "an amendment to the proposed Emergency School Assistance Act [which became the Emergency School Aid Act] that will expressly prohibit the expenditure of any of those funds for busing" (Third Party Plaintiffs' Collective Exhibit 18). On August 11, 1973, Press Secretary Ronald L. Zeigler told newsmen at a White House briefing that federal officials who did not accede to President Nixon's busing policy would either be transferred to another government job or fired. Zeigler's warning was reported in the press the following day (Id.).

Dr. Goldberg's policy letter and President Nixon's statement on busing alarmed Drs. Brooks and Watts, prompting Dr. Brooks to write Dr. Goldberg on August 9, 1971 (Third Party Plaintiffs' Exhibit 2). In that letter, Dr. Brooks protested what he felt was a change in policy, reiterated the necessity for financial assistance for buses, and notified him that Nashville would retain its request for transportation assistance. At this juncture, the Nashville authorities were discouraged about the prospects for obtaining ESAP funds for buses, but felt it still was possible to get such funds. They became disabused of this view on August 19, 1971, when Dr. Brooks received a call from Mrs. McIntosh in the Regional Office at Atlanta. She told Dr. Brooks that the transportation requests should be dropped and indicated that such requests were no longer fundable.

Parenthetically, it should be noted that, during the summer of 1971, the third party defendants were in the process of drafting new regulations for ESAP that ultimately became effective on August 21, 1971. These new regulations were the governing regulations for ESAP-II, and the only material change from those governing ESAP-I was an amendment providing for top priority assistance to local boards implementing, in the 1971-1972 school year, a court-ordered desegregation plan which imposed new or additional requirements pursuant to *Swann, supra.* 45 C.F.R., Part 181, § 181.3. By virtue of the additional busing requirements imposed by this court under the *Swann* mandate, therefore, the Metropolitan Nashville school system was afforded a top-priority eligibility for ESAP funds under the new regulations.

Despite Mrs. McIntosh's advice and policy statements from Government officials, the school board retained the requests for funds for activities related to busing in its ESAP application for the 1971-1972 school year. As predicted, however, the third party defendants refused to fund those activities, and Nashville's ESAP grants for the 1971-1972 school year, approximately one and one-half million dollars, did not include any funds for busing expenses.

Since this initial refusal to provide the Metropolitan Board of Education with emergency assistance funds for busing expenses, the third party defendants have denied all of Nashville's numerous requests, under both ESAP and ESAA, for such assistance; and the third party defendants have consistently declined to give any reasons for such denials, other than to say that requests for busing expenses were not "approvable" under the prevailing regulations and policies. Indeed, it affirmatively appears of record that the third party defendants have refused to fund any busing requests from any school district from the inception of ESAP-II to the present.[7]

---

7. The record also discloses that there was a surplus of funds appropriated by Congress for ESAP-II which was returned to the United States Treasury. The funding period for ESAA, of course, has not yet expired.

With the foregoing summary of events as background, the court now turns to the evidence in this case specifically relating to the definition of the policy in question and to its implementation.

For reasons which are readily apparent, the third party defendants' policy on busing expenditures was exposed to public scrutiny for but a limited period of time, that being generally the summer of 1971, following the *Swann* decision. This brief exposure, however, corresponds with the period during which the Nashville school authorities were preparing and making their initial application for busing expenses under ESAP and having some discourse with various administrators of that program. Consequently, the evidence in this case sheds more light, perhaps, on the content of the policy than its limited exposure would suggest, and several witnesses were able to testify about the policy and how it worked.

The two witnesses to testify in open court were Drs. Brooks and Watts, the two officials with the Metropolitan Board of Education who dealt directly with administrators of ESAP and ESAA in the attempts to obtain funds for busing expenses for the Metropolitan Board of Education. Their testimony was that they both attended the Atlanta meeting, conducted by Dr. Goldberg, on July 28, 1971, for the purpose of briefing school superintendents on the ESAP guidelines. Although Nashville had not requested federal funds for transportation in the previous school year (under ESAP–I), Drs. Brooks and Watts were hoping to get some ESAP assistance for transportation for the 1971–1972 school year, it being made necessary because of expanded busing requirements and the refusal of the local authorities to provide adequate transportation funds for the 1971–1972 school year. Both felt that funding for transportation was Nashville's most critical need, and their questions about the availability of ESAP funds for transportation needs were uppermost in their minds as they attended this meeting.

Quite naturally, then, Dr. Brooks asked Dr. Goldberg at this Atlanta meeting about the availability of ESAP funds for transportation. In fact, he asked the question at two different times. Dr. Brooks testified that Dr. Goldberg's first answer was rather vague, to the effect that proposals would be forwarded from Atlanta to Washington and that transportation requests would have to be submitted along with other proposals. Dr. Goldberg's response to the question when repeated later gave Dr. Brooks the impression that transportation requests would be judged on the same basis as any other request. Dr. Watts testified that Dr. Goldberg, in answer to Dr. Brooks' question, said that transportation funding was possible under ESAP, and that, as a result of Dr. Goldberg's statements, he felt more optimistic about the prospects for obtaining ESAP funds for busing expenses than before. Both men testified that they left the meeting encouraged about those prospects.

The school officials were disappointed, therefore, when they received Dr. Goldberg's letter of July 30, 1971, the so-called policy clarification letter. Dr. Brooks responded immediately with a protest to Dr. Goldberg (Tr. Ex. # 2). Despite Goldberg's letter, and within days thereafter, the White House's statements on busing, discussed *supra*, Dr. Watts and Dr. Brooks still felt funding for busing was possible and included a request for funds in the amount of approximately two million dollars for activities related to busing as part of Nashville's application for over three and one-half million dollars in ESAP funds. This application was submitted on August 12, 1971, to the Regional Office in Atlanta.

On August 19, 1971, Mrs. McIntosh called from the Regional Office and suggested to Dr. Brooks that the transportation requests be dropped, informing him that such requests would not be

funded. He got the impression from Mrs. McIntosh that there had been a change in policy, although he testified on cross-examination that he could not recall whether she used the phrase "change of policy" or "policy clarification."

The next day Dr. Brooks sent a letter in which he pointed out the critical need for buses and advanced the view that, in spite of Presidential pronouncements, there was nothing in the statute or the regulations that prohibited the funding of transportation requests under ESAP (Tr. Ex. # 3).

The evidence demonstrates that, upon receipt of the ESAP funds, minus the requested funds for transportation-related expenses, Dr. Brooks and Dr. Watts made numerous attempts throughout the 1971–1972 school year to obtain ESAP funds to help alleviate the busing shortage that was having such a drastic effect on the process of desegregation in the Nashville public schools, all to no avail.

In a late January, 1972, conference with Mrs. McIntosh and R. T. Alexander, Contracting Officer for the Regional Office in Atlanta, Dr. Watts was informed that transportation requests were not being funded under ESAP–II, although transportation had been funded under ESAP–I.

The remainder of the testimony of the two school officials dealt primarily with the subsequent busing requests and proposals submitted by the Metropolitan Board of Education at numerous times throughout calendar year 1972 and the first half of 1973. These requests were under both ESAP and its successor, ESAA. They testified that all requests for financial assistance for transportation-related activities were denied under both of the above emergency assistance programs, that no specific reasons were given for these denials, and that Dr. Goldberg maintained throughout that the transportation policy was grounded on the belief that the States should provide transportation funds for schools. Based on this experience with the emergency assistance programs, Dr. Watts opined that there has been a shift, through administration, away from addressing the basic problems of desegregation and toward programs that were more "compensatory" in nature, thus eliminating the "emergency" portion of the "emergency school assistance" concept.

The other four witnesses to testify about the policy, all by deposition, are government employees who, at all times material, were (and are) involved at different echelons in the administration of the emergency assistance programs. Of the four, Dr. Sydney T. Marland, Jr., as Commissioner of Education from December 20, 1970, until November 1, 1972, and as Assistant Secretary of Education from then until the present, holds the highest position in the hierarchy of the Department of Health, Education, and Welfare. Administration of the emergency assistance programs is under his general supervisory control. Under Dr. Marland is Dr. Herman Goldberg who, as Associate Commissioner of Education for Equal Educational Opportunity, is directly responsible, by delegation, for administering programs under Title IV of the Civil Rights Act of 1964, ESAP and ESAA. Below Dr. Goldberg in the decision-making chain is Dr. John R. Lovegrove, the Senior Program Officer for the Equal Educational Opportunity Program in the Atlanta Region. The fourth, Mrs. Polly B. McIntosh, is the Program Officer for Tennessee in the Equal Educational Opportunity Program, Atlanta Region, and, as such, is a member of Dr. Lovegrove's staff.[8] Nei-

---

8. The normal routing of an application for funds under ESAP or ESAA begins at the Program Officer level where it is scored quantitatively and qualitatively and forwarded to the Regional Commissioner with a recommendation. It goes from there to Dr. Goldberg's office with a recommendation, from whence it is sent, with a recommendation, to the Commissioner's Office. According to Dr. Goldberg, it is "not normal" for the Regional Commissioner to change the recommendation of the Senior Program Offi-

ther Dr. Lovegrove nor Mrs. McIntosh is named as a third party defendant in this action. The analysis of the testimony of these witnesses will begin with Mrs. McIntosh, the officer with whom the Nashville school authorities had the most contact.

Mrs. McIntosh began working in the Atlanta Regional Office as a Program Officer in January of 1970. Her duties were concentrated primarily in the application process and, consequently, she had a working knowledge of the funding policies applicable to the emergency assistance programs.

As a part of her duties in connection with ESAP, Mrs. McIntosh attended the ESAP guidelines briefing for school superintendents on July 28, 1971, in Atlanta. She testified that she was present when Dr. Brooks questioned Dr. Goldberg about the availability of ESAP funds for meeting increased busing expenses incident to court-ordered desegregation and that Dr. Goldberg explained to the superintendents that money would be available for purchasing buses and that they could apply for busing funds. She also thought she recalled Dr. Goldberg indicating to Dr. Brooks that there would be a low priority on such applications, but she was somewhat uncertain on this point. In any event, she testified that, based on what was said at the meeting and what she understood the past policy to be, she felt that funds for student busing would be available (McIntosh deposition, p. 13).

According to her testimony, however, she subsequently learned that no funds were to be awarded for busing activities and perceived this as "a change from the impressions and information we had received earlier." *Id.,* p. 14. It was her understanding that the policy of "low priority" was changed to one of "zero priority" sometime within the period between July 28, 1971, and the time the Regional Office began processing applications, which had to have been before

August 19, 1971 (*Id.,* pp. 15–16). She said that the instruction regarding "zero priority" was transmitted by "word of mouth" as "general information;" it was not reduced to writing (*Id.,* p. 16 and p. 25). She did not recall receiving the instruction as to "zero priority" from Dr. Lovegrove, her superior, but assumed it came from him.

With respect to how the third party defendants' policy on busing was implemented, the testimony of Mrs. McIntosh about her review of Nashville's application is significant, for it indicates a general administration procedure for reviewing requests for busing funds under the emergency assistance programs. She testified that she had no option to look at transportation requests except as an "unallowable cost" (*Id.,* p. 20). There was no inquiry as to whether the request was justified, since she could not approve it under any circumstances.

Finally, it should be noted that Mrs. McIntosh did corroborate the testimony of Drs. Brooks and Watts concerning her phone call of August 19, 1971, to the extent that she had a file memorandum on that call which showed that the Regional Office recommended a deletion of the requests for student transportation and that she recalled that she informed Dr. Brooks that transportation funding would not be authorized (*Id.,* p. 22). She was not asked, nor did she comment, however, about whether she told Dr. Brooks in that same conversation that the failure to authorize the transportation requests was attributable to a change in policy, as Dr. Brooks testified.

The testimony of Dr. John Lovegrove, Senior Program Officer, Atlanta Regional Office, discloses that, in the opening weeks of ESAP–I, the Regional Office was making determinations on transportation requests, but that the Regional Office later was requested to send applications containing transportation components to Washington for study (Lovegrove deposition, p. 14). He testi-

---

cer, and the recommendation of the Regional Commissioner is followed in ninety-five per-

cent of the cases [Goldberg deposition, pp. 9–11].

fied that some transportation requests were funded under ESAP–I and that these requests were "given careful scrutiny in terms of need" (*Id.*, p. 7). He recalled that the policy on transportation changed a short time after the date of Dr. Goldberg's Atlanta meeting or the policy letter of July 30, 1971, and that, before this time, the Regional Office was not operating under any instructions assigning a low priority to transportation (*Id.*, pp. 11, 18). Pursuant to the policy change, he instructed Mrs. McIntosh "that the transportation component would receive a low priority consideration," but said he never instructed her that requests for home-school busing were ineligible for funding (*Id.*, pp. 9–10). He said there was no *written* policy to that effect (*Id.*). When pressed by counsel concerning his instructions about the policy, Dr. Lovegrove said he did not think he implied a "zero priority" in his instructions to Mrs. McIntosh, but conceded that the implication could have been there and that the effect of the change in policy was an absolute stoppage of ESAP funding for transportation (*Id.*, p. 12).

In most respects, Dr. Lovegrove's testimony substantiates that of the witnesses previously discussed and, in general, the third party plaintiffs' allegations. The testimony of these witnesses, however, differs in most respects from that of the two third party defendants whose depositions were received in evidence.[9] Their testimony is summarized below.

Dr. Herman Goldberg, as noted, is the government officer and third party defendant primarily responsible for the actual administration of the programs here at issue. Consequently, it would be reasonable to expect that he could shed substantial light on the third party defendants' school transportation policy;

but, unfortunately, this was not the case. Although he was present at the July 5th hearing and counsel for the Government had indicated that Dr. Goldberg would be called to the stand, he was not; and the only testimony that is before the court from Dr. Goldberg is his deposition, taken in Washington, D. C., on March 26, 1973. At best, that testimony can be characterized as evasive and fraught with error, inconsistency and contradiction.

He testified that the only discussions on the student transportation policy in which he participated took place shortly after the Supreme Court's decision in *Swann* (Goldberg deposition, pp. 17–18). No concrete decision was reached on such a policy at that time, although Dr. Goldberg and Dr. Marland, based on their experience as school superintendents, formed the general view that local school boards should look to the State for transportation funds (*Id.*). In this regard, he also was of the opinion that the emphasis of the emergency assistance programs should be on instructional, as opposed to logistical, needs, and that the former should have a higher priority because of the limited amount of funds appropriated and the number of applications received (*Id.*, p. 16). Dr. Goldberg had no knowledge of any written policy on student transportation that may have existed before *Swann* (or during ESAP–I), but erroneously thought that no funds for home-school transportation had been delivered under ESAP–I (*Id.*, pp. 28, 31, 32). According to his testimony, then, no concrete decision was reached on the transportation policy in discussions had within the Office of Education, but he had formed his own opinion about transportation funding, reinforced by Dr. Marland's view, and was under the erroneous impression that home-school busing had not been funded under ESAP–I.

---

9. In evaluating the testimony of the four government employees whose depositions were submitted in this case, the court has found that the candor and clarity of the testimony of these witnesses were in inverse proportion to their rank in the chain of command, with the possible exception that Dr. Goldberg was less candid that Dr. Marland.

Dr. Goldberg's tentative conclusions about transportation funding provide some insight into the testimony about the Atlanta meeting on July 28, 1971. He testified that, although he told the superintendents that school transportation would be eligible for ESAP funding (*Id.*, p. 33), he gave them "[his] general view" that they should look to the State for such funds (*Id.*) and that, therefore, student transportation would be an "item of lower priority" (*Id.*, p. 25).

This policy statement was followed, within two days, by the policy letter of July 30, 1971, described *supra* at p. 10. According to Dr. Goldberg, he received a call from his deputy, Dr. William C. Rock, in which Dr. Rock said: "We have had word from across the street that the low priority for funds for busing that we have announced, needs to be put in writing." (Id., p. 43.)[10] Thereupon, Dr. Goldberg instructed him to draft a memorandum for his review. Dr. Rock called him back and, after minor revisions, was instructed to "shoot it off." Although Dr. Goldberg maintains that this letter was merely a reiteration of his Atlanta remarks, it is clear to the court that the content and tenor of the policy letter is markedly different from that of his statements in Atlanta to the school superintendents, even if the court accepts as factual Dr. Goldberg's recitation of his statements in Atlanta concerning funds for transportation.

According to Dr. Goldberg, this marked an end to the matter of transportation funding, insofar as his instructions are concerned, because he had not talked to Dr. Marland about the policy except before the Atlanta meeting, and there had been no further communication with Dr. Lovegrove or others in Atlanta after the July 28th meeting or the July 30th letter (*Id.*, p. 67).

What the final word from Dr. Goldberg was on this matter, however, is somewhat in doubt. His own testimony reflects that he used the words "low priority" when describing the transportation policy to the superintendents in Atlanta (*Id.*, p. 25); the words, "a very low priority," in the letter of July 30th; and, in discussions with his staff, said that school transportation had "the lowest priority" (*Id.*, p. 50). At one point in his deposition, he even went so far as to agree that there were no funds available for student transportation (*Id.*, p. 56).

In any event, Dr. Goldberg admitted that the transportation policy was not based on the applicable statutes and regulations, but was merely the result of the exercise of administrative judgment (*Id.*, p. 100). He also admitted that, in formulating this policy, he was not operating under the amendments relating to the *Swann* decision in the new regulations for ESAP–II (*Id.*, p. 41). He testified that the same transportation policy was followed in administering ESAP–II and ESAA (*Id.*, p. 57), and that the net effect of that policy has been that no funds for student transportation have been authorized under these programs (*Id.*, p. 36).

When questioned about the impact of the White House statements of August 3, 1971, and August 11, 1971, on the transportation policy, Dr. Goldberg was evasive, but did testify that he did not consider these statements to be threats or warnings (*Id.*, p. 53). In this regard, Dr. Goldberg said he interpreted the White House position on busing to be a prohibition against the use of student transportation funds for ". . . the elimination of racial imbalance or the reduction of racial isolation" (*Id.*, pp. 52–53). He said that these statements were not a factor in his decision

10. Dr. Goldberg said the expression "across the street" connoted H.E.W., meaning, *inter alia*, that the "word" had not come from the immediate superior, Dr. Marland. It is curious that Dr. Goldberg said that he has never discovered to whom Dr. Rock talked from "across the street," and that he still has no idea from whom the "word" came (*Id.*, p. 47).

on his transportation policy in administering ESAP, implying, by his statement that there were no funds for student transportation to "get them out of racially-isolated cities" (*Id.*, p. 56), that his policy was consistent with the White House policy, as he interpreted it. This, however, conflicts with his later statement that money was "available to meet the needs incident to problems relating to reduction of racial isolation." (*Id.*, p. 69.)

In order to assess adequately the impact of the two White House statements, Dr. Goldberg's varied definitions of his transportation policy and of the July 30th policy letter, on the administration of the emergency assistance programs, however, resort must also be had to Dr. Goldberg's explanation of how applications from the school districts were judged. As part of the administration of the emergency assistance programs, there is a specific dollar amount allocated to each State, and the local school districts have to compete with other school districts within their State for funds from that specific allocation (*Id.*, pp. 38, 61). The local school districts compete through their applications and their applications, of course, are judged by the third party defendants and their agents. Thus, a school district must bear in mind the items on which the third party defendants place a higher priority if it wishes to compete favorably with other districts (*Id.*, pp. 61–62). If it does not apply for those items on which a higher priority is placed, it runs the risk of losing out competitively, since its application might be considered "out of proportion with [those of] their competitors" (*Id.*, p. 38). In other words, if a school district wants to compete favorably with other school districts for a limited amount of funds, it would be well advised to include in its application only those items or activities which the third party defendants want to fund. Thus, the significance of Mrs. McIntosh's advice to the Nashville authorities, on August 19, 1973, *e. g.*, to delete the "low priority" transportation items from their application, is brought into sharp focus because a district which requests low, or zero, priority items runs a considerable risk in the competition. This competition factor also casts an entirely different light on Dr. Goldberg's revelation that local school districts had not been asking for federal funds for transportation funds in the past couple of years (*Id.*, p. 38).

This brings the court to the last witness, Dr. Sydney T. Marland, Jr., a third party defendant, to give evidence in this cause. His deposition was taken on March 26, 1973, in Washington, D. C. The following summary of his testimony is somewhat brief, due to the fact that the court, despite repeated perusals, has found much of his testimony beyond the court's powers of comprehension.

Dr. Marland testified that the policy did not prohibit the funding of home-school transportation activities and corroborated Dr. Goldberg's testimony that it was a policy of "low priority" for busing requests (Marland deposition, p. 32). He said that the third party defendants felt it was necessary to draw a distinction between "educational" (*i. e.*, "instructional") programs and "logistical" programs for purposes of administering the emergency assistance funds and that, having drawn that distinction, they placed more importance on instructional needs (*Id.*, p. 9). He agreed with Dr. Goldberg's view that transportation funding was a State responsibility (*Id.*, pp. 22, 23). Given these judgments and the fact that the funds appropriated by Congress were limited, Dr. Marland said he expected that there would be no funds for transportation requests (*Id.*, pp. 9, 10, 12). Indeed, he felt it had been made clear to those concerned that the emergency funds were for instructional needs (*Id.*, p. 19), and admitted that the Administration's stand on busing probably had had an impact (*Id.*, p. 28).

The most striking aspect about the testimony of both Dr. Goldberg and Dr. Marland is the disparity between what the policy was, as defined by their

words, and what the policy was, as defined by their description of its operation. When asked a direct, often leading, question about their definition of the policy, both would declare it was a "low priority" policy and deny it was a "zero priority" policy; but, when they described the operation of the program and the policy, its rationale and effect, out of the morass of verbiage came the unmistakable picture of a policy that ruled out emergency assistance funds for home-school student transportation.[11] This situation compels the following factual conclusions, set forth below in narrative form.

During the initial year, 1970–1971, of the third party defendants' administration of the emergency assistance programs, requests for funds to meet the cost of expanded home-school transportation requirements incident to desegregation were eligible for funding, and some of these requests were, in fact, funded under ESAP–I. There was no written policy on student transportation requests at this time, although the third party defendants, perhaps, did manifest a note of caution by directing that all transportation requests be sent to Washington for study.

This approach to school transportation requests was radically changed in the summer of 1971, following the Supreme Court's busing decision in Swann v. Charlotte-Mecklenburg Board of Education. On July 28, 1971, the new policy was defined for the school superintendents as one of placing a lower priority on transportation requests, although such requests would still be eligible for funding; but, within two days, the third party defendants issued a policy letter on school transportation which clearly showed that "low priority" meant much more than just "low priority," since a reading of that letter shows that the districts were directed to apply for ESAP funds only for "direct education purposes" and to look to their respective

State governments for transportation funding. If any doubts remained about the policy, these were shattered in early August by the statements of the President and his Press Secretary. The new policy, so adopted, ruled out the use of emergency assistance funds for home-school student transportation.

■ As far as the testimony of Dr. Goldberg, Dr. Marland, and, to some extent, Dr. Lovegrove, is concerned, there are two possible conclusions: either the third party defendants publicly defined their policy as a "low priority" policy and privately instructed the staff that the policy was actually a flat prohibition against the funding of student transportation; or they merely called it a "low priority" policy, intending that to mean that no such funds could or would be granted and knowing that those in the lower echelons would understand that this was the actual meaning of the policy. The evidence will support no other conclusion but that the policy flatly prohibited the disbursement of emergency assistance funds for home-school transportation.

The policy came into being purely as the result of administrative judgment and did not even purport to be based on the applicable statutes and regulations. Indeed, it seems to contradict the amended regulations promulgated for ESAP–II. It was implemented, beginning with the applications for funding under ESAP–II, and pursued in a rather insidious manner; for, although a policy of absolute prohibition was never reduced to writing, those on down the chain of command were given to understand, and did understand, through "word of mouth" instructions that no ESAP funds were to go for home-school student transportation. Moreover, it was enforced, in most cases, informally through advice to districts caught in a competitive scramble for a limited amount of allocated funds.

11. This latter interpretation of the policy, of course, is what Mrs. McIntosh understood

the policy to be and what she related to Dr. Brooks and Dr. Watts.

Although there is no direct evidence in this record to support the third party plaintiffs' allegation that the revised policy toward student transportation was mandated by President Nixon, the coincidence between the revision of the policy and that announcement of the White House's position on school busing is, perhaps, too striking to be overlooked. At the very least, it must be concluded that the Administration's policy had an impact on the operation of the third party defendants' policy.

Finally, the court finds that the policy adopted by the third party defendants in the summer of 1971 has been followed and enforced continuously since that time, resulting in the denial of any and all requests for student transportation financial assistance and that the numerous requests by the Metropolitan Board of Education for busing funds under ESAP–II and ESAA have been denied pursuant to that policy.

Inasmuch as the court has concluded that the questioned policy absolutely prohibited the use of emergency assistance funds for home-school transportation, it is necessary to determine the legality of that policy under the Constitution and applicable statutes.

## THE LEGAL QUESTION

In defense of their enforcement of the policy under consideration, *supra,* the third party defendants rely on two principal propositions: (1) their acts were lawful because they had the discretion under the applicable statutes to set and enforce such a policy; (2) the court lacks jurisdiction, in that the suit is foreclosed by the doctrine of sovereign immunity, there is no statutory basis for the exercise of federal jurisdiction in this case, and the third party plaintiffs lack the requisite legal standing to maintain this action.

The contentions listed under (2), *supra,* have heretofore been determined adversely to the third party defendants (Memorandum of February 23, 1973),

except that the scope of discretion question's effect on the jurisdictional issues was not before the court. Thus, the only question remaining is whether the third party defendants' adoption and implementation of a policy of no consideration to requests for funding home-school transportation was within the ambit of their discretion under the applicable statutes.

As a preface to the consideration of this question, it should be noted that the question before the court is not whether the third party defendants had discretion under the Congressional delegation of authority, in acting on home-school transportation requests, but whether that discretion embodied the kind of blanket action they in fact took with respect to such requests. Consequently, this inquiry must begin with an examination of statutory authority for those programs. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415–416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The Emergency School Assistance Program grew out of the section entitled "Emergency School Assistance" in Title I of the Office of Education Appropriations Act, 1971 (Public Law 91–380, 84 Stat. 800).[12]

The appropriation thereunder was based on the authority of several previous enactments, the most pertinent being Title IV of the Civil Rights Act of 1964. 1970 U.S. Code Congressional & Administrative News. In Title IV, Congress authorized, *inter alia,* the Commissioner of Education to provide technical assistance to school boards in the ". . . preparation, adoption, and implementation of plans for the desegregation of public schools." 42 U.S.C. § 2000c–2. According to its own terms, the purpose of the appropriation for Emergency School Assistance was to provide ". . . assistance to desegregating local educational agencies. . . ." Together, the foregoing passages provide the basis for the definition of the program's purpose, as stated

12. It was passed over President Nixon's veto on August 18, 1970.

in the regulation promulgated by the Department of Health, Education, and Welfare to govern ESAP.

"The purpose of the emergency assistance to be made available under the program . . . is to meet *special* needs . . . incident to the elimination of racial segregation and discrimination among students and faculty in elementary and secondary schools *by contributing to the costs of new or expanded activities* to be carried out by local educational agencies . . . to achieve successful desegregation and the elimination of all forms of discrimination in the schools on the basis of race, color, religion, or national origin." 45 C.F.R. § 181.2 (Emphasis added.)

The Office of Education Appropriation Act, 1971, also contains certain express restrictions on the use of funds appropriated thereunder, one of which is relevant to this discussion. In Section 210, of Title II, Congress provided as follows:

"No part of the funds contained in this Act shall be used to force any school or school district which is desegregated as that term is defined in Title IV of the Civil Rights Act of 1964, Public Law 88–352, to take any action to force the busing of students, . . . ." Vol. 1, U.S.Code Cong. & Admin.News (1970), p. 946.

By negative implication, therefore, it could be concluded that appropriations for busing were authorized by the Act, except to the extent that such funds could not be used to force a desegregated school to bus students.

The definition of the purpose of the appropriations bill, as found in the above cited statutes and regulations, lends support to this conclusion.

That busing was an authorized and contemplated activity under the legisla-

tive mandate is further demonstrated by the regulations governing ESAP. First, it is clear that school busing would fall within the category of "Authorized Activities," as set forth in Section 181.4. The section begins with the provision that "[p]rojects assisted under the program shall be designed to contribute to achieving and maintaining desegregated school systems. . . ." It goes on to list five categories of activities that the projects should "emphasize," the last of which is subsection (E), "Carrying out special comprehensive planning and *logistic* support designated to *assist in implementing* a desegregation plan. . . ." (Emphasis added.)

Second, the statement of the purpose of the program, in Section 181.2 (quoted *supra*), indicates school transportation as a principal activity to be funded and, when read with the amended portion of the regulation referring to the *Swann* decision,[13] strongly suggests that assistance for expanded busing imposed by court order pursuant to the constitutional requirements of *Swann* would be at the head of the list of activities to be funded.

Under subsection (a)(1) of Section 181.3, the section entitled "Eligibility," it is provided that

"[a]ssistance under the program may be made available to a local educational agency which is implementing a plan for the desegregation of its schools which plan (i) has been undertaken pursuant to a final order of a court of the United States or of any State, or of a State administrative agency of competent jurisdiction, issued or modified on or after April 20, 1971, pursuant to the constitutional requirements as set forth by the U.S. Supreme Court in 'Swann v. Char-

---

13. This amendment, found in 45 C.F.R. § 181.3(a)(1)(i), was the only change in the regulations governing ESAP–I that has any bearing on the issues at bar. Consequently, the foregoing references to the regulations do not distinguish between those governing

ESAP–I and those for ESAP–II. Likewise, there is no distinction between ESAP–I and ESAP–II in terms of the statutory authority because ESAP was re-enacted *in toto* for the 1971–1972 school year under a continuing appropriations bill (Public Law 92–38).

lotte-Mecklenburg Board of Education,' and its companion cases. . . . ."

Subsection (a)(2) of Section 181.3 provides that an agency eligible under subsection (a)(1) has priority over agencies eligible under other subsections.

Finally, the evidence in this case demonstrates that the third party defendants have interpreted the foregoing statutes and regulations to mean that transportation was eligible for funding under ESAP; for they have funded transportation activities, except for the home-school type, throughout the emergency assistance programs, and, during the 1970–1971 school year, they funded some home-school busing, this being under ESAP–I and before the policy changed.

This interpretation must be given weight by the court. Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

Having examined the status of home-school transportation under ESAP, the inquiry focuses on the successor program, ESAA. Examination of transportation under ESAA is aided, in no small measure, by the comprehensive nature of the Act which authorized the program, the provisions on school transportation which accompanied that Act and the legislative history of these enactments.

The Emergency School Aid Act was enacted as Title VII of the Educational Amendments of 1972 (Public Law 92–318), and is codified at 20 U.S.C. § 1601 et seq. Title VIII of the same legislation, codified at 20 U.S.C. § 1651 et seq., deals with the assignment and transportation of students, and, for purposes of this discussion, these two titles must be considered together. The legislative history of Public Law 92–318 is found at pages 2462 et seq., 1972 United States Code Congressional & Administrative News.

■ In general, the Emergency School Aid Act was enacted to provide financial assistance to local educational agencies in order to aid in the process of eliminating or preventing minority group isolation and in improving the quality of education for all children. Subsection (b) of 20 U.S.C. § 1601 defines the purpose of the Act as one of providing financial assistance—

"(1) to meet the special needs incident to the elimination of minority group segregation and discrimination among students and faculty in elementary and secondary schools;

"(2) to encourage the voluntary elimination, reduction, or prevention of minority group isolation in elementary and secondary schools with substantial proportions of minority group students; and

"(3) to aid school children in overcoming the educational disadvantages of minority group isolation."

The Act, *inter alia,* sets forth eligibility priorities and requirements for receipt of funds (§ 1605), a list of authorized programs and projects (§ 1606), general requirements governing the application process (§ 1609), approval of applications (§ 1609(c)), and conditions for consideration, approval and disapproval of applications (§ 1609(d)).

While the foregoing provisions of Title VII of the Act show merely that home-school transportation incident to court-ordered desegregation was a fundable activity under ESAA, the provisions of Title VIII clearly demonstrate that funding of such activities under ESAA was contemplated and intended by the Congress.

In the section dealing with the use of appropriated funds for busing, Congress prohibited the use of the funds ". . . for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to overcome racial imbalance in any school or school system. . . ." In addition, the use of these funds for transportation-related expenses was prohibited even for carrying out a plan of school desegregation, unless the appropriate school officials submitted an ". . . express written voluntary re-

quest . . . [therefor]." 20 U.S.C. § 1652(a). The use of ESAA funds for busing was authorized, therefore, in those cases where the school officials had voluntarily requested funds for such an activity and where the transportation was not for the purpose of achieving a racial balance in the schools. It is the legislative history of Titles VII and VIII, however, that provides the greatest insight into Congress' intent with respect to busing. The legislative history discloses that the House of Representatives passed an amendment to the Act which forbade the use of any funds for transportation services. 1972 U.S.Code Congressional & Administrative News, p. 2669. This, of course, is identical to President Nixon's announced position on the funding of transportation activities under the emergency assistance programs, as set forth *supra*. This amendment was ultimately rejected by the Congress and the conference agreement substituted the language now contained in 20 U.S.C. § 1652(a), quoted *supra*.

The rationale underlying the provision that prevailed over the House amendment is found in the following passage taken from Senate Report 92–604:

"This language [20 U.S.C. § 1651] makes clear that in no way does the Committee amendment require the assignment or the transportation of any student or teacher in order to overcome imbalance or achieve desegregation. The Committee amendment would provide financial support for school desegregation, including, where necessary transportation services, undertaken pursuant to desegregation plans under a Federal Court order, the Civil Rights Act of 1964, State law or court orders, or a voluntary plan initiated by the local educational agency.

"Transportation to achieve desegregation has been undertaken in communities throughout the nation—as a matter of wholly voluntary local education policy, or under Federal court or administrative order to remedy unconstitutional discrimination, or under State law. Although Title VII does not require the transportation of students, funds under Title VII could be used at the request of local school officials to assist in paying the cost of desegregation-related transportation.

"The Committee believes that a prohibition against Federal assistance to meet the cost of desegregation-related transportation at the request of local school authorities would result in additional tax levies at the local level, or cutbacks in vital education services in many of these communities" (*Id.*, U.S.Code Cong. & Admin.News 1972, p. 2605).

Two conclusions are thus compelled by this examination of Titles VII and VIII of the Educational Amendments of 1972: First, it must be concluded that the Congress intended that ESAA funds be used to assist local school boards in meeting the expenses of carrying out student transportation requirements as part of a court-ordered desegregation plan, subject to restrictions which are not here applicable; second, Congress actually rejected an amendment which was virtually identical to the transportation policy adopted by the third party defendants.

■ Accordingly, based on its examination of the statutes and regulations governing the two programs in question, ESAP and ESAA, the court finds that Congress authorized the use of emergency assistance appropriations for home-school transportation expenses necessitated by the requirements of court-ordered desegregation, that such use was not only authorized, but contemplated, by the Congress, and that, in enacting Section 1652(a), Title 20 of the United States Code, it expressly rejected the prohibition of such use.

It now becomes necessary to determine whether the foregoing statutes authorize, as discretionary acts, the actions taken by the third party defendants in this case.

In asserting that the acts in question were within the scope of their discretion, the third party defendants place

principal, if not exclusive, reliance on the decision in the case of Duval County School Board v. Richardson, No. 71–965–Civ.–J–T (M.D.Fla.1973) (unreported). In that case, the plaintiff school board sought to compel the release of a portion of an ESAP grant for the 1971–1972 school year which was being withheld by the Department of Health, Education, and Welfare, because the plaintiff intended to use the grant to pay for transportation costs necessitated by court-ordered desegregation. In dismissing the case for lack of jurisdiction, the District Court ruled the decision of the defendants to withhold funds solely because they were to be used for student transportation was a decision "committed to agency discretion by law" and was therefore not reviewable.[14] The court based its holding upon the finding that there were no statutory guidelines for such action, thus evidencing an intent of Congress to rely on agency discretion. This finding resulted from the following conclusions: the statutes under which the appropriations bill was passed and the program created contained no reference to the use of federal funds for student transportation; the only explicit reference to transportation [§ 210 of Public Law 91–380] in the appropriations bill was not applicable because the funds at issue were not to be used for the purpose proscribed in that section; and the nature of problems of fund allocations in this area and the specialized expertise required for the program's administration made it unlikely

that Congress "contemplated judicial intervention to obtain piecemeal review of agency decisions made in this framework."[15]

Not being legally bound, of course, by the decision of the Florida District Court in *Duval County*, this court respectfully declines to follow either the decision in the case or the reasons underlying that decision. The most critical point of distinction between this case and the *Duval County* case is that, whereas the case at bar involves action pursuant to a general prohibition against home-school transportation funding, *Duval County* was apparently restricted to deciding whether the defendants had the discretion to deny transportation funds to the plaintiff in that particular instance.[16] With this latter perspective, the conclusion that Congress did not contemplate "piecemeal" judicial review of such decisions is more plausible; but this perspective fails to consider the distinction between having discretion to grant, *vel non*, funds in a particular case and having discretion to set an absolute policy that applies in all cases. The critical area of disagreement is with that Court's conclusion that there were absolutely no statutory guidelines with respect to the administration of transportation requests under ESAP, and particularly its opinion that Section 210 of Public Law 91–380 was not applicable merely because that section had not been violated in that case.

■ Based on its examination of the facts in this case and interpretation of

14. The court also held that, although the plaintiff's claim of the deprivation of a Fifth Amendment right presented a "federal question" under 28 U.S.C. § 1331 and the suit would resolve a conflict over monies in excess of $10,000, thus giving the court federal question jurisdiction, the plaintiff could not obtain relief under the Declaratory Judgment Act because the property interest asserted was not sufficient in the constitutional sense, it being a "mere expectancy."

15. Of some importance in this regard, perhaps, is that fact that the plaintiff school board conceded that the statutory authority for ESAP could be interpreted to preclude the use of such funds for student transpor-

tation. Obviously, this interpretation is diametrically opposite to that reached in the present case.

16. The body of the Court's opinion indicates that it did view the issues in this restrictive light. In footnote # 5 to the Opinion, however, the Court noted that the distinction between a low priority policy and an absolute ban was not material in that particular case. To the extent, if any, that this statement may have been intended to mean that the distinction was immaterial in all cases of this genre, including the present case, this court respectfully disagrees for the reasons appearing *infra*.

the statutes applicable herein, the court holds that, although the third party defendants certainly had (and have) the discretion in administering ESAP and ESAA to deny particular requests for student transportation funding in a particular case, they did (and do) not have the discretion to deny *in futuro* all such requests by the adoption and enforcement of a blanket policy that removed (removes) .those requests from any legitimate consideration whatsoever. Commonwealth of Pennsylvania v. Weinberger, 367 F.Supp. 1378 (D.D.C.1973). For example, it would have been within the third party defendants' discretion to deny Nashville's requests for busing funds based on a reasonable and legitimate judgment of the merits thereof, as defined by the statutes and regulations; but, inasmuch as transportation requests were authorized by the governing statutes and regulations, it was not within the third party defendants' discretion to refuse approval of such requests by resort to a blanket policy of prohibiting home-school transportation requests. By their actions in this regard, the third party defendants, in effect, performed a very precise, but complete, piece of surgery on the statutes and regulations, excising one specific type of authorized activity. In so doing, they actually amended the ESAP statutes and the Emergency School Aid Act, and repealed the transportation provisions of Title VIII of the Educational Amendments of 1972, thus usurping the legislative function, exceeding their authority under the statutes and abusing the discretion they had in administering these programs. Citizens to Preserve Overton Park v. Volpe, *supra*; Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587–589, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

■ It follows, therefore, that the adoption and enforcement of the policy complained of herein were not discretionary acts and do not fall within the narrowly drawn exception for action "committed to agency discretion." Citizens to Preserve Overton Park v. Volpe, *supra*, 401 U.S. p. 410, 91 S.Ct. 814.

Accordingly, for these reasons and the reasons cited in the Memorandum and Order of February 23, 1973, the court has jurisdiction under the Mandamus Act (28 U.S.C. § 1361) and the Administrative Procedure Act (5 U.S.C. § 701 et seq.).

Under the standards for review contained in § 706 of the Administrative Procedure Act (5 U.S.C. § 706), the court finds the actions of the third party defendants and their transportation policy to be illegal for the reasons set forth below.

First, the third party defendants' blanket refusal to fund home-school transportation requests was illegal as in excess of powers granted to them by the applicable statutes and an abuse of discretion delegated them thereby. Citizens to Preserve Overton Park v. Volpe, *supra*; Commonwealth of Pennsylvania v. Weinberger, *supra*; Local 2677, American Federation of Government Employees v. Phillips, 358 F.Supp. 60 (D.D.C.1973).

Second, the third party defendants' actions were illegal because they actually violated the purpose and intent of the Congressional enactments they were executing. Given the Supreme Court's approval, in *Swann*, of court-ordered busing where that device was essential to the dismantlement of a dual school system, this court's holding that busing was necessary to dismantle the racial duality of the Nashville schools, and the express Congressional purpose underlying the statutes authorizing ESAP and ESAA, it is obvious that the third party defendants' transportation policy restricted the means for fulfilling that Congressional purpose, and, in this case, actually thwarted that purpose. The record shows that these federal officers played a substantial role in effectively impeding the process of desegregation in the Nashville public schools while administering federal programs intended by Congress to assist local educational agencies in achieving desegregated education. Clearly then, the actions of these federal administrators in contra-

vening the Congressional purpose underlying ESAP and ESAA were, and are, illegal. State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir. 1973).

Third, the court finds that the evidence establishes that the third party defendants violated the Emergency School Aid Act, particularly 20 U.S.C. § 1609(d)(2) by failing to notify the Metropolitan Board of Education of the specific reasons, within the meaning of that section, for the repeated disapprovals of transportation requests.

■ Finally, the court finds the actions of the third party defendants to be unlawful on constitutional grounds.

First, the third party defendants violated the procedural due process guarantee of the Fifth Amendment in that they failed to follow their own governing regulations and the applicable statutory requirements. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1955); Berends v. Butz, 357 F.Supp. 143 (D.Minn.1973).

Second, in administering the emergency assistance programs in a manner that belied the very purpose of those programs, the third party defendants violated their duty, as executive officials, to "take Care that the Laws be faithfully executed." Constitution of the United States, Article II, Section 3; Local 2677, American Federation of Government Employees v. Phillips, 358 F.Supp. 60 (D.D.C.1973).

Third, the third party defendants violated the equal protection rights of the original and third party plaintiffs by enforcing the blanket prohibition against federal funding for school transportation. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693 98 L.Ed. 884 (1954). In the court's opinion, these federal officials placed the Executive Branch of the federal government in violation of the mandate of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and broke the long-standing commitment of this Government to elim-

ination of segregation in this nation's schools.

In essence, the third party defendants erected a barrier between the lawful desegregation order of a federal court and Congressionally authorized assistance for school desegregation, and the refusal to consider such assistance thwarted implementation of the desegregation order. So long as the Congressional commitment to the assistance of education and the Supreme Court's approval of busing as a tool to achieve desegregation coexist, an officer, agency or branch of the federal government may not constitutionally prohibit the use of such assistance for school busing incident to court-ordered desegregation where, as here, such action obstructs the process of desegregation.

## RELIEF

Having concluded that the third party defendants have acted in violation of the statutes and Constitution of the United States and, accordingly, that the third party plaintiffs are entitled to relief in this cause, the court must now determine what relief can and must be given.

■ While this court cannot invade the legitimate province of the third party defendants' discretion and order them to grant the Metropolitan Board of Education's requests for transportation funds, the court can order the third party defendants to cease enforcement of the illegal and unconstitutional transportation policy and to act within their discretion on such a request.

Accordingly, the court declares the transportation policy of the third party defendants to be illegal and unconstitutional. It is therefore ordered that, if there are ESAA funds which have not been obligated, as of the date of this order, under the appropriation for the year ending June 30, 1974, the third party defendants shall entertain any voluntary express written request, already submitted or submitted within thirty (30) days of the entry of this order, for transportation assistance under ESAA

from the Metropolitan Board of Education and shall judge same solely under the criteria set forth in 20 U.S.C. § 1601 et seq., and shall approve or disapprove that request consistent with the requirements thereunder.