**1528**

AMERICAN BANKERS
ASSOCIATION, Plaintiff,

v.

William J. BENNETT, Secretary of the
United States Department of
Education, Defendant.

Civ. A. No. 84–1455.

United States District Court,
District of Columbia.

Sept. 16, 1985.

John J. Gill, Gen. Counsel, Michael F. Crotty, Asst. Gen. Counsel Litigation, Washington, D.C., for plaintiff.

Lewis K. Wise, Stanley E. Alderson, Dept. of Justice, Civ. Div., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

STANLEY S. HARRIS, District Judge.

Before the Court now are defendant's motions for judgment on the pleadings and for summary judgment and plaintiff's motion for summary judgment. The Court has considered the motions, the oppositions thereto, the replies, and the other pleadings and the affidavits filed herein and is of the opinion that no genuine issue of material fact exists. The Court concludes that the plaintiff is entitled to summary judgment in its favor, to a permanent injunction enjoining the defendant Secretary of Education (hereinafter Education) from withholding payments due to commercial banks under the Guaranteed Student Loan Program, and to a declaration that the practice of so withholding is unlawful under the factual situation presented by this case.

### I. *Background of the Controversy*

The plaintiff, American Bankers Association (ABA), is a trade association for the commercial banking industry and appears here in a representative capacity on behalf of its some 12,688 commercial bank members. The ABA challenges the legality of deductions made by Education, at the be-hest of the Department of the Treasury (hereinafter Treasury), from payments otherwise due member banks of the ABA under the Guaranteed Student Loan Program. The deductions are in the amounts allegedly owed by those banks to Treasury because of payments made on forged or altered Treasury checks. Education contends that the deductions are authorized by the Debt Collection Act of 1982, 31 U.S.C. § 3716, and regulations issued thereunder.

Under the Debt Collection Act (DCA), the head of an agency is directed to "try to collect a claim of the United States Government for money or property arising out of the activities of, or referred to, the agency." 31 U.S.C. § 3711. The head of an agency may collect a debt subject to the DCA by administrative offset after giving the debtor various procedural rights such as written notice and an opportunity for inspection and review. 31 U.S.C. § 3716(a)(1)–(4). In accordance with the DCA, Treasury issued regulations which deal specifically with offsets against banks arising from the payment of Treasury checks bearing forged or unauthorized endorsements. 31 C.F.R. Part 240 (1984). These regulations were adopted after public rulemaking proceedings in which the ABA participated. The regulations provide that if Treasury is unable otherwise to recover money paid to the bank in satisfaction of a check paid over a forged or unauthorized endorsement, the matter may be referred to another federal agency with a request that that agency offset the indebtedness against amounts already owed by the other federal agency to the presenting bank. 31 C.F.R. § 240.7. Such requests have been made and honored as to approximately 54 banks by Education.

The funds withheld from the banks were payments owed them by Education under the Guaranteed Student Loan Program. 20 U.S.C. §§ 1078 *et seq.* Under that program, the Government makes mandatory payments of interest and special allowances to banks holding student loans. 20 U.S.C. §§ 1078(a)(3)(A), 1087–1(b). In reliance upon the provisions of the Higher Education Act (HEA) of 1965, 20 U.S.C.

§ 1001 *et seq.*, many ABA member banks have extended loans to students. The banks are approved as eligible lenders by Education and duly submit requests for payments of interest benefits and special allowances. Because Education has honored Treasury's requests for offsets, the full amounts requested by the banks have not always been paid.

## II. *Preliminary Issues*

The defendant has challenged the plaintiff's standing to bring this action. In addition, Education argues that the relief sought is barred by sovereign immunity. The Court concludes that the plaintiff has standing and that the doctrine of sovereign immunity does not apply.

### A. *Standing*

■ In challenging the ABA's standing, Education characterizes the relief sought as the equivalent of an award of money damages against the United States. Education argues that because the relief sought could require the payment of money from the Government to various banks for improper offsets, it is a claim for money damages with respect to which the ABA lacks standing. Where "the damage claims are not common to the entire membership, nor shared by all in equal degree" and where "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof," associations generally lack standing. *Warth v. Seldin*, 422 U.S. 490, 515–16, 95 S.Ct. 2197, 2213–14, 45 L.Ed.2d 343 (1975). The nature of the claims in this case, argues Education, requires the individual participation of the affected member banks.

■ The Court finds that argument unpersuasive. First, a mandamus claim, as here, is not transformed into a suit for damages merely because the writ could require the expenditure of money through a ministerial act. *Starnes v. Schweiker*, 715 F.2d 134, 142 (4th Cir.1983); *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C.Cir.1974). The obligation to pay interest subsidies and special allowances is ministerial in that it is nondiscretionary, clearly defined, and indisputable under the Higher Education Act. Second, the amounts of money owed under the HEA are known and undisputed and, therefore, Education readily was able to offset the amount allegedly due Treasury. It is the amounts due the Treasury that are disputed and subject to individualized proof and defenses. Those amounts are not material to the question at hand and do not affect the plaintiff's standing to challenge the Government's interpretation of the HEA and the DCA. Finally, the ABA has standing to sue on behalf of its members because it has alleged (1) that the banks have suffered injury in fact from Education's action, and (2) that such injury is within a zone of interests protected and regulated by the HEA. *See Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The complaint states that certain member banks are entitled to interest subsidies and special allowances which have been withheld by Education. Those banks, as eligible lenders, "have a contractual right, as against the United States" to receive determined interest and special allowances. 20 U.S.C. §§ 1078(a)(3)(A), 1087–1(b)(3). It is only reasonable to believe that any remedy, if granted, will inure to the benefit of those members of the association actually injured by the offsets. *See Warth v. Seldin*, 422 U.S. at 515, 95 S.Ct. at 2213–14 (1975).

### B. *Sovereign Immunity*

■ The doctrine of sovereign immunity which has been raised by Education has no applicability to this case. The Secretary of Education is subject to suit under the HEA. 20 U.S.C. § 1082(a)(2). The Administrative Procedure Act allows suit for other than relief in monetary damages. 5 U.S.C. § 702; *National Treasury Employees Union v. Campbell*, 589 F.2d 669, 673 n. 7 (D.C.Cir.1978). Where restitution is a logical adjunct to other primary equitable relief, it is available in the absence of a

waiver of sovereign immunity. *Griffin v. Harris*, 480 F.Supp. 1072 (E.D.Pa.1979). Finally, even if the doctrine applied, Congress, through the HEA, has appropriated funds for a specified purpose and directed Education to expend those funds in the manner set forth in the statute. Where Education has failed to expend those funds as directed, it has acted in excess of its statutory authority, which is a recognized exception to the doctrine of sovereign immunity. *See Commonwealth of Pennsylvania v. Weinberger*, 367 F.Supp. 1378 (D.D.C.1973); *City of New York v. Ruckelshaus*, 358 F.Supp. 669, 673 (D.D.C.1973).

### III. *Discussion*

The language of the HEA's Guaranteed Student Loan Program is direct and mandatory. In order to encourage institutions to provide low cost loans to students who otherwise would not be able to afford higher education, Congress has appropriated funds to be expended for interest subsidies and special allowances. A student to whom a loan is made under the Program "shall be entitled to have paid on his behalf ... to the holder of the loan a portion of the interest...." 20 U.S.C. § 1078(a)(1). "The holder of a loan with respect to which payments are required to be made ... shall be deemed to have a contractual right, as against the United States, to receive from the Commissioner the portion of interest which has been so determined." 20 U.S.C. § 1078(a)(3)(A). "The Commissioner shall pay this portion...." *Id.* "A special allowance shall be paid...." 20 U.S.C. § 1087-1(b)(1).

Guarantees such as these are necessary incentives because even with the interest subsidies and special allowances, the banks' return on the loans is low. An inordinate amount of paperwork is required, first to process the loans and then to collect from Education. As stated in the plaintiff's affidavits, the banks' participation in the program is more "as a public service than as a profit making enterprise of the bank."

In contrast to the mandatory language of the HEA, the Debt Collection Act uses language of option and discretion. For example, the head of an agency shall "try to collect a claim of the United States" and after "trying to collect a claim," the head of an agency "may collect the claim by administrative offset." 31 U.S.C. §§ 3711(a)(1), 3716(a). That the authority to offset is merely discretionary further is illustrated by regulations issued pursuant to the DCA. One agency, such as Treasury, "may" refer the matter to another agency and "request" an offset. 31 C.F.R. § 240.7(a).

The strongest language qualifying the authority of the head of any agency to effect offset is provided by the Federal Claims Collections Standards:

> Whether collection by administrative offset is feasible is a determination to be made by the creditor agency on a case-by-case basis, in the exercise of sound discretion. Agencies should consider not only whether administrative offset can be accomplished, both practically and legally, but also whether offset is best suited to further protect all of the Government's interest. * * * Agencies may also consider whether offset would tend to substantially interfere with or defeat the purposes of the program authorizing the payments against which offset is contemplated.

4 C.F.R. § 102.3(a)(2). This section imposes an obligation on agency heads to take into account the effect the offset would have on other Government programs. Therefore, only when Treasury has made a determination that an offset would not substantially interfere with or defeat the purposes of the program authorizing the payments against which the offset is contemplated may it request an offset by another agency. This section makes explicit the non-mandatory nature of the offset authority and the considerations involved in its exercise.

Once Treasury makes a request of another agency, the standards direct that "[g]enerally, agencies should not refuse to com-

ply with requests from other agencies to initiate administrative offset to collect debts owed to the United States unless the requesting agency has not complied with the applicable provisions of these standards or the offset would be otherwise contrary to law." 4 C.F.R. § 102.3(d). Again, discretion must be exercised, this time by the offsetting agency, to ensure that the offset is in compliance with the Standards or not otherwise contrary to law. Thus, the offsetting agency must determine that in making the offset it is not substantially interfering with or defeating the purpose of a program that Congress has entrusted it to administer. The overriding theme of these regulations and of the DCA is that the collection of debts is to be encouraged and facilitated within the confines of established law, but not in contravention of other Government programs. Offset is a qualified and limited method of collection. In light of the strong language of the HEA and the possibility of frustrating its purpose, it is important that both Treasury and Education comply with all of the procedural requirements of the DCA and consider a requested offset's effect.

The procedural requirements of the DCA allow administrative offset only if the head of the agency attempting to collect provides the debtor:

(1) written notice of the type and amount of the claim, the intention of the head of the agency to collect the claim by administrative offset, and an explanation of the rights of the debtor under this section;

(2) an opportunity to inspect and copy the records of the agency related to the claim;

(3) an opportunity for a review within the agency of the decision of the agency related to the claim; and

(4) an opportunity to make a written agreement with the head of the agency to repay the amount of the claim.

\*     \*     \*     \*     \*     \*

31 U.S.C. § 3716(a). Furthermore, before collecting a claim by administrative offset, regulations must be prescribed based on various considerations including "the best interests of the United States Government." 31 U.S.C. § 3716(b).

By Education's admissions, it has never issued any regulations regarding administrative offset. Instead, it relies on Treasury's regulations and refers any questions regarding the offset to Treasury. Education argues that it need not duplicate the procedures since Treasury has established regulations which specifically provide the procedures mandated by the DCA. Since the procedures need not be duplicated, Education argues, separate regulations need not be promulgated by Education. The defendant relies on 4 C.F.R. § 102.-3(b)(2)(ii), which provides that in "cases where the procedural requirements specified in paragraph (b)(2) of this section have previously been provided to the debtor in connection with the same debt under some other statutory or regulatory authority, ... the agency is not required to duplicate those requirements before taking administrative offset."

■ The Court disagrees with the defendant's reading of the DCA and the regulations. The Standards echo the DCA in stating that "[a]gencies shall prescribe regulations for the exercise of administrative offset." 4 C.F.R. § 102.3(b)(1). The preceding language is unclear as to whether both the requesting and the offsetting agency must establish regulations, but the subsection goes on to provide that "[a]gency regulations shall also establish procedures for making requests for offset to other agencies holding funds payable to the debtor, and for processing requests for offset that are received from other agencies." Thus, appropriate regulations are necessary for agencies at both ends of the offsetting process. An agency, such as Treasury, must promulgate regulations to establish procedures for making requests. A direct and separate obligation is imposed upon agencies processing requests for offsets to establish independent regulations for doing so.

This reading of the regulation, requiring independent regulations establishing proce-

dures for processing requests, is necessary for three reasons. Two of these reasons arise from the processing agency's obligations under the Federal Claims Collections Standards to determine that the requesting agency has complied with the procedural protections of the Standards and the DCA and that the offset would not otherwise be contrary to law. 4 C.F.R. § 102.3(d). Currently, Education has established no procedures to make these determinations; rather, it refers all questions to Treasury. This is in contravention of its obligations and is legally inadequate.

The third reason stems from the realities of the banking industry. In an age of branch offices, specialized departments, and complex financial arrangements, a form notice to a bank from Education stating only that money owed has been withheld and turned over to Treasury, without further information as to why the money allegedly is owed, is inadequate. Such a notice would go to a student loan officer, who then would have to refer it to any number of departments responsible for Treasury matters such as taxes, Government securities, fines or penalties related to operations of the bank, or to the sale of Government savings bonds in order to determine why the money was withheld. If the notice reaches those responsible for presenting Treasury checks, the particular checks involved in the reclamation must be identified by the bank since the notice from Education does not provide this information. This is especially troublesome since the sum of money withheld by Education may bear no relationship to the amount originally sought by Treasury in the Treasury notice which had been sent to the bank prior to the offset pursuant to 4 C.F.R. § 102.3(b)(2). When the Treasury notice first was sent, the bank determined those checks for which it would deny liability, those for which it would pay, and those for which it would seek additional documentation. In the midst of undertaking these determinations or after notifying Treasury of such, the offset notice would arrive from Education, thereby putting the bank in the accounting dilemma of seeking to match the sums in both notices to its records to determine which debts had cleared, which defenses were honored, or even which Treasury checks had been paid twice, i.e., by the offset and by the banks' acquiescence to liability based upon the first notice from Treasury.

This scenario illustrates the need for specific and particularized procedures for Education's honoring of a Treasury request for offset. The current practice of honoring the requests without question circumvents and renders nugatory the procedural protections of the Federal Claims Collections Standards as provided by Treasury, since the offset may occur prior to completion of the bank's determination as to its liability for certain Treasury checks. Furthermore, it unacceptably adds to the already burdensome paperwork involved in the Guaranteed Student Loan Program. Finally, because of the above two adverse effects of the current practice, it jeopardizes the entire Guaranteed Student Loan Program. Banks will become increasingly unwilling to participate in what threatens to become an unguaranteed program.

In summary, then, although Education relies upon the DCA and the regulations promulgated thereunder, and although the Court fully supports the Government's just debt collection efforts, Education has not complied with the terms or intent of either authority. It has collected debts through administrative offset without satisfying the procedural prerequisites established by the DCA. Furthermore, it has not established any regulations to provide the procedural protections to which a debtor is entitled. This failure is particularly harmful where, as here, it jeopardizes the continued viability of a separate, major program which has been established by Congress. In failing to pay banks their full entitlements to interest subsidies and special allowances, despite the mandatory language of the law directing it to do so and, instead, surrendering the funds to another agency without establishing or providing any protective procedures, Education has interfered with the purpose of the Higher Education Act.

Because Education has not complied with the directives of Congress and prescribed regulations to establish procedures for processing requests for offsets from other agencies so as not substantially to interfere with or defeat the purpose of the Guaranteed Student Loan Program, it is in violation of the law.

### IV.  *Conclusion*

■ In accordance with the foregoing and because the Court concludes that the plaintiff is entitled to summary judgment in its favor, to a permanent injunction enjoining Education from withholding payments due to commercial banks under the Guaranteed Student Loan Program for reasons unrelated to the Program itself, and to a declaration that the practice of so withholding funds is unlawful, it hereby is

ORDERED, that the plaintiff's motion is granted.  It hereby further is

ORDERED, that the defendant, his agents, officers, employees, attorneys, their successors, and all other persons in active concert with them are permanently enjoined from withholding funds otherwise due commercial banks under the Guaranteed Student Loan Program by reason of any requests from the Department of the Treasury to "offset" amounts allegedly owed by the said banks to Treasury in the absence of the adoption and utilization of proper regulations as discussed above.  It hereby further is

ORDERED, that the practice of the defendant in so withholding funds in the factual and legal context of this case is declared unlawful.

SO ORDERED.